439 F.Supp. 1351 (1977)
In the Matter of the VALUATION PROCEEDINGS UNDER §§ 303(c) AND 306 OF the REGIONAL RAIL REORGANIZATION ACT.
No. 76-1.
Special Court, Regional Rail Reorganization Act.
April 19, 1977.
On Motion for Reconsideration July 5, 1977.
*1352 *1353 David B. Isbell, Washington, D. C. (Edwin M. Zimmerman, Jeffrey S. Berlin, Jeffrey G. Huvelle, and Covington & Burling, Washington, D. C., John B. Rossi, Philadelphia, Pa., of counsel), for Penn Central Trustees and certain affiliated transferors.
David C. Toomey, Philadelphia, Pa. (Jared I. Roberts, and Duane, Morris & Heckscher, Philadelphia, Pa., of counsel), for trustee of the Lehigh Valley R. Co.
Harry G. Silleck, Jr., New York City (John L. Altieri, Jr., and Mudge, Rose, Guthrie & Alexander, New York City, of counsel), for Trustees of Erie Lackawanna Ry. Co., and certain affiliated non-bankrupts.
Stanley Weiss, Newark, N. J. (M. Elaine Jacoby, Dean R. May, and Carpenter, Bennett & Morrissey, Newark, N. J., of counsel), for Trustee of the Central R. Co. of New Jersey.
Louis A. Craco, New York City (Walter H. Brown, Jr., Thomas L. Bryan, Michael B. Targoff, Rebecca T. Halbrook, Richard L. Posen, and Willkie Farr & Gallagher, New York City, Frederic L. Ballard, Sr., and Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., of counsel), for intervening Penn Central lienholders.
Joseph Auerbach, Boston, Mass. (Morris Raker, Thomas R. Wardell, Thomas D. Halket, Harvey E. Bines, and Sullivan & Worcester, Boston, Mass., James Wm. Moore, New Haven, Conn., of counsel), for trustee of The New York, New Haven and Hartford R. Co.
Howard H. Lewis, James A. Sox, and Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., Lockwood W. Fogg, Jr., Plymouth Meeting, Pa., for trustees of the Reading Co. and for its wholly-owned subsidiaries.
Timothy V. Smith, New York City, for trustee of The Lehigh and Hudson River Ry. Co.
Joseph J. Connolly, and Goodman & Ewing, Herbert G. Schick, and Hepburn, Ross, Willcox & Putnam, Philadelphia, Pa., Jerome K. Walsh, and Walsh & Frisch, New York City, for secondary debtors of The Penn Central Transp. Co.
Charles I. Thompson, Jr., Philadelphia, Pa., for The North Pennsylvania R. Co., the Delaware and Bound Brook R. Co., and Philadelphia, Germantown and Norristown R. Co.
Perrin C. Hamilton, and Hamilton, Darmopray & Malloy, Philadelphia, Pa., for the East Pennsylvania R. Co.
Alan C. Kauffman, and Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for the Peoria and Eastern Ry. Co.
Joseph S. Radom, and Thomas B. Radom, Detroit, Mich., for trustee of the Ann Arbor R. Co.
George F. Galland, Robert W. Ginnane, and Galland, Kharasch, Calkins & Brown, Washington, D. C., for Norwich & Worcester, R. Co.
William T. Lake, and Louis R. Cohen, Washington, D. C. (Lloyd N. Cutler, William R. Perlik, David R. Johnson, and Wilmer, Cutler & Pickering, Kevin P. Charles, Robert H. Kapp, Howard R. Moskof, George W. Mayo, Jr., and Hogan & Hartson, Washington, D. C., Cary W. Dickieson, Gen. Counsel, Stephen C. Rogers, Deputy Gen. Counsel, and Jordan Jay Hillman, Sp. Counsel, U. S. Ry. Ass'n, Washington, D. C., of counsel), for United States Ry. Ass'n.
Paul M. Tschirhart, Dept. of Justice, Washington, D. C. (Rex E. Lee, Asst. Atty. Gen., and John H. Broadley, Dept. of Justice, Washington, D. C., Donald T. Bliss, Deputy Gen. Counsel, Alexander P. Humphrey, and Justine Fischer, U. S. Dept. of Transp., Washington, D. C., of counsel), for United States of America.
FRIENDLY, Presiding Judge:

I. Introduction

Section 303(c)(1)(A) and (2) of the Regional Rail Reorganization Act of 1973 as amended (the Rail Act) directs this court to determine whether the transfers and conveyances *1354 which took place on April 1, 1976, were for a consideration more or less than the constitutional minimum[1] "taking into consideration compensable unconstitutional erosion, if any, which the special court finds to have occurred in the estate of each such railroad, during the bankruptcy proceeding with respect to such railroad".[2] Section 306(c)(4) provides that one item to be included in the base value of each series of certificates of value (CV's) authorized by § 306 shall be "such amount, if any, as the special court may determine shall be required after taking into consideration compensable unconstitutional erosion, if any, in the estate of a railroad in reorganization, or of a railroad leased, operated, or controlled by such a railroad, which the special court finds to have occurred during any bankruptcy proceeding with respect to such railroad".[3] These provisions appeared for the first time in the amendments made by the Railroad Revitalization and Regulatory Reform Act of 1976 (RRRRA), evidently in response to indications in our opinion of September 30, 1974 (180-Day Appeals), In re Penn Central Transportation Co., 384 F.Supp. 895, 918-26, and the Supreme Court's opinion in Regional Rail Reorganization Act Cases, 419 U.S. 102, 122-25, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), that the process provided by the Rail Act might involve what the Supreme Court called an "erosion taking" of property of the transferors for which the Fifth Amendment would require just compensation. Because of the limited powers accorded us by the original Rail Act with respect to securities issuable to the transferors, those opinions envisioned that the task of determining the existence and amount of such erosion would devolve primarily upon the Court of Claims under the Tucker Act, 28 U.S.C. § 1491; the effect of the 1976 amendments was to transfer that task, or at least the bulk of it, to this court.[4] The claims are large; an *1355 approximation of the claim of the Penn Central Trustees for pre-conveyance erosion runs to nearly $900 Million.
In our Memorandum and Order of June 16, 1976, Directing Preliminary Proceedings for the Determination of General Principles under §§ 303 and 306 of the Act (June 16 Memorandum), we identified "three sets of legal issues" with respect to compensable unconstitutional erosion (CUE) which we thought could be presently "determined without awaiting the completion of detailed studies on the subject".[5] 425 F.Supp. 276, 284-85. These were:
(1) The date when the transferors contend that valid erosion claims began;
(2) Any date later than March 31, 1976 to which the transferors contend that erosion continued;
(3) The categories (and some approximation of the amounts) of erosion claims.[6]
Consideration of the briefs and arguments has led us to conclude that it would be best to defer decision on the item of post-conveyance erosion claims, identified above as (2). These claims fall into three categories  interest on loans made pursuant to § 211(h); alleged inadequacy of rentals for property subject to rail service continuation payments under § 304(c)(2);[7] and erosion with respect to properties designated as "suitable for use for other public purposes" and required to be temporarily retained under § 304(b)(2). The nature of these claims is altogether different from pre-conveyance CUE claims; their amount, if any, is not now determinable; decision with respect to some (notably the second) may be dependent on later decisions in the valuation phase of the case; and failure to pass upon them at this time will not delay the progress of these proceedings.[8] Both the Government parties and those transferors who spoke on the matter indicated a willingness to have us postpone consideration of these issues. We shall thus defer decision on them, with the proviso that at any time this court may, or any party may *1356 request us to, restore all or some of these questions to the active list, with proper notice and such further opportunity, if any, for additional briefing and argument as we may think appropriate.
We shall therefore deal in this opinion only with pre-conveyance CUE claims. As was suggested at the argument, we shall treat the brief of the Government parties as a motion for summary judgment that, subject to certain reservations hereafter noted, there are no valid claims. Further we shall deal in this opinion only with the issue of when, if ever, such claims began to accrue.
The organization of the balance of this opinion shall be as follows: In Section II, after a brief statement of the general nature of the claims, we shall set forth the history giving rise to the claim of the Penn Central Trustees. This will be followed by Section III in which we shall analyze the authorities. In Section IV we shall state our general conclusions in regard to the accrual of pre-conveyance CUE and apply these to the Penn Central. A further Section V shall deal with the claims of other bankrupt estates for pre-conveyance CUE, and in a final Section VI we shall make some concluding remarks.

II. The Nature of the Claims and the History Giving Rise to the Claim of the Penn Central Trustees

The term "compensable unconstitutional erosion" is a newcomer to the legal lexicon.
As recognized in our previous opinions, June 16 Memorandum, 425 F.Supp. at 284-85; see In re Penn Central Transportation Company, D.C., 384 F.Supp. 895, 923 (1974), "erosion" of estates such as those of the railroads here before us falls into two major categories. Financial erosion arises from the creation of claims such as administration expenses, trustees' certificates, and taxes which have priority over the claims of pre-bankruptcy creditors, and use for operations of cash or property held as security for liens. Physical erosion consists of the depletion of property through such means as loss of nonescrowed cash and deterioration of physical plant, which result in the property having a lesser value at the end of the period than at the beginning.[9]
Erosion as such has no constitutional implications; it is suffered in some forms by many losing businesses outside bankruptcy as well as within it and by commercial or manufacturing enterprises as well as by public utilities. Unconstitutional erosion arises only when a losing business has been required to continue to operate against its will for more than a reasonable period.
It is not clear just what Congress considered it was adding by the adjective "compensable". Perhaps it was of the view that even unconstitutional erosion was not always compensable, but if so, it did not state what the critical factors were deemed to be. In the preceding paragraph we deliberately used the passive voice "has been required" and did not elaborate on the meaning of the verb "require". By adding the word "compensable" Congress may have meant to emphasize the importance of two elements that are implicit in the concept of "unconstitutional" erosion itself, namely, that the claimant should have made manifest its desire to quit operating and should have applied for authorization necessary to that end, and that some identifiable agency of government having power to do so should have thwarted its desires.
The principle underlying the claims for CUE derives from three Supreme Court decisions of the early 1920's, Brooks-Scanlon Company v. Railroad Commission of Louisiana, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323 (1920); Bullock v. Florida ex rel. Railroad Commission of Florida, 254 U.S. 513, 41 S.Ct. 193, 65 L.Ed. 380 (1921); and Railroad Commission of Texas v. Eastern Texas Railroad, *1357 264 U.S. 79, 44 S.Ct. 247, 68 L.Ed. 569 (1924). All three involved small railroads[10] whose business had become so unprofitable that they could not continue operations except at a loss.[11] The Supreme Court held they could not constitutionally be compelled to do so. The most important single statement in these cases was Mr. Justice Holmes' in Brooks-Scanlon, 251 U.S. at 399, 40 S.Ct. at 184:
If the plaintiff [railroad] be taken to have granted to the public an interest in the use of the railroad it may withdraw its grant by discontinuing the use when that use can be kept up only at a loss.[12]
Efforts to distinguish these cases as inapplicable to large railway systems important to the public or to dismiss them as outmoded were rejected by the lower courts in the New Haven Inclusion Cases, see New York, New Haven and Hartford Railroad First Mortgage 4% Bondholders' Committee v. United States, 289 F.Supp. 418, 440-41 (S.D.N.Y.1968); In re New York, New Haven and Hartford Railroad, 304 F.Supp. 793, 802-04 (D.Conn.1969), modified and aff'd sub nom. New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970); New York, New Haven and Hartford Railroad First Mortgage 4% Bondholders' Committee v. United States, 305 F.Supp. 1049, 1055 (S.D.N.Y.1969), vacated on other grounds sub nom. New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970); by the Third Circuit in the Columbus Option case, In re Penn Central Transportation Company, 494 F.2d 270, 278-82, cert. denied, U.S. v. Bankers Trust Co., 419 U.S. 883, 95 S.Ct. 147, 42 L.Ed.2d 122 (1974); by this court on the 180-Day Appeals, 384 F.Supp. at 918-19; and most importantly, by the Supreme Court in Regional Rail Reorganization Act Cases, 419 U.S. 102, 122, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). The transferors claim to be entitled to pre-conveyance CUE from the date of "accrual" of their "Brooks-Scanlon rights"; the serious issues are whether these ever did "accrue" prior to conveyance and, if so, when.
The Penn Central Trustees contend that this accrual occurred on October 1, 1973, some three months before the Rail Act was enacted. They base their claim on the history of the Penn Central reorganization proceedings. In extended summary this history was as follows:
The Trustees contend that Penn Central was in danger of collapse almost from the time it entered bankruptcy on June 21, 1970. On December 22, 1970, faced with an imminent total depletion of working cash, due in part to a retroactive wage increase mandated by Congress on December 10, 1970 in order to halt a nationwide strike, the Trustees petitioned the reorganization court, 325 F.Supp. 302 (E.D.Pa.1971), for authority to issue $100 million of trustees' certificates to be guaranteed by the United States under the then proposed and shortly thereafter enacted Emergency Rail Services Act of 1970 (ERSA), 84 Stat. 1975. The petition was opposed by the Trustee of the New Haven, who had become a large creditor and stockholder as a result of the inclusion of the New Haven in the Penn Central, see New Haven Inclusion Cases, 399 U.S. *1358 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970), the indenture trustees of various mortgages, and stockholder interests. One of the § 77 Trustees testified there was a reasonable prospect that within three to five years the PC would be restored to "viability" in the sense of having some income available for the payment of fixed charges, 325 F.Supp. at 304. The Secretary of Transportation had likewise found, as required by ERSA, that "the railroad can reasonably be expected to become self-sustaining." Id. The reorganization court (Judge Fullam) granted the Trustees' petition. He found that this was "not a situation of attempting to require the railroad to be operated permanently at a loss," citing Brooks-Scanlon, although "[f]undamental statutory and administrative changes, affecting such matters as rate-making, abandonments or subsidization of uneconomical lines, and labor arrangements, will undoubtedly be required if continued viability of railroads, especially Eastern railroads, is to be assured."
In a report dated February 10, 1971, the Trustees affirmed that the Penn Central could be successfully reorganized if (a) the passenger service was handled in accordance with the principles of the National Railway Passenger Service Act of 1970; (b) the freight service plant was rationalized; (c) changes were made in the regulation of freight rates; and (d) employment and labor policies were significantly modified. If such "rational terms" were provided, Penn Central could be viable; to the extent they were not, provision must "be made for some different form of compensation for any extra costs incurred for reasons beyond the control of those responsible for the enterprise." The report did not indicate just how, as a practical matter, this largely unprecedented and halcyon solution was to be achieved.[13] Further reports were made in March and September 1971; in the latter the Trustees professed satisfaction "with the time schedule of the reorganization effort thus far," noting they had not yet completed their projections of future traffic levels, which studies were necessary to assess the railroad's viability, asking six more months to test "whether a rational labor pattern can be established," and reporting "substantial progress" in alleviating deficits from passenger service and the launching of an "active abandonment program."[14]
*1359 The Trustees made a more comprehensive report on February 15, 1972. They announced that in their judgment "Penn Central can be successfully reorganized." (Emphasis in original). They conditioned this prophecy, however, on the attainment of certain forecasts of traffic volume and freight revenues and "the accomplishment of three basic changes in the Penn Central situation which will require action beyond the sole competence of the management, the Trustees, or this Court: rationalization of the Penn Central plant, removal of unnecessary labor costs, and full compensation for continuing passenger service losses." They stressed the importance of consummating a plan before continued operations "so erode the Debtor's estate as to be either practically or constitutionally impermissible." They concluded by saying:
It should be possible for Federal, state and local governments and all interested parties to analyze the situation as presented in this Report and to come to conclusions as to whether they are prepared to cooperate in achieving the changes necessary to allow the Penn Central to continue as a private enterprise. If an adequate response should not be forthcoming, the Trustees will be prepared to advise the Court that this reorganization proceeding is producing a result for which Section 77 was not intended and could not constitutionally have been intended. We do not expect that default.[15]
The Chairman of the Interstate Commerce Commission wrote the reorganization judge that the report constituted
in effect, clear notice to the public that the Penn Central cannot be reorganized successfully in the manner normally contemplated by section 77 of the Bankruptcy Act. What the trustees are telling us, in short, is that assistance must be forthcoming from the National government, from State and local governments, from shippers and receivers of freight, from passengers, from railroad employees, and from all others who will benefit by continued Penn Central operation if the railroad is to survive. We agree, and we commend the trustees for their candor and for their realistic approach.
On April 1, 1972, the Trustees filed a plan of reorganization expected to become realizable in 1976. This plan proceeded on the assumption that PC's earned income available for fixed charges would reach $275 million by 1976, failing which the plan would be withdrawn. On the effective date of the plan, PC was to be authorized to abandon any uneconomic lines whose operating losses had not by then been covered through contractual arrangement or a subsidy policy, and to terminate any passenger service for which it was not fully compensated; in addition, the plan noted the importance of meeting the railroad's projected increase in freight revenues and in reducing labor expenses. The Trustees defended their proposed abandonment program against the complaints of some creditors by noting that 11,000 miles of track had been identified as the "freight core" of a reorganized system; these lines had generated 80 percent of the PC's freight operating revenues in 1970, although studies of the projected operating results of such a cut-down system for 1972-1976 were expected to take until September 1972. Noting the New Haven Trustee's criticism of the reorganization plan, that
[e]ven if an income plan could be devised which carried the hope of some interim success by 1976, the adverse characteristics of the Penn Central system service area ... flash all the signs of the New Haven's own prior experience. The New Haven was "successfully" reorganized in 1947 after a proceeding which began in 1938, only to become bankrupt again in 1961.
the Trustees replied that they believed that
given reasonable time and help from others ... viability will be established, and Penn Central will emerge as a strong carrier with sufficient earning power to operate with confidence in the future.
*1360 On October 1, 1972, the Trustees reported that their studies indicated that a 15,000 mile freight core system could produce $243 million income available for fixed charges in 1976, assuming the usual four requisites were substantially attained; this larger system seemed more profitable than an 11,000 mile system because of labor expenses which could be only gradually reduced. The Trustees also discussed possible alternatives to a conventional private incomebased reorganization, including public assistance to supply operating costs or capital needs, but noted that this discussion was "not a position of pessimism but one of prudence so that the Court, the public and all interested parties may begin to consider the alternatives."
The Trustees' Interim Reports of January 1 and February 1, 1973 struck a new note. In addition to the three types of outside assistance outlined in the report of February 15, 1972, the Trustees now considered that the Penn Central would require government aid in the range of $600-$800 million. This need was due to two principal factors  delays in realizing some of the goals set in the Trustees' earlier reports, with consequent increase in priority claims, and realization that attainment of the traffic and revenue projections required larger expenditures for modernization of plant. The February 1 report again took note of the large savings that would result from changing the existing 20,000 mile railroad (with gradual abandonments down to 15,000 miles) to an 11,000 mile railroad,[16] and acknowledged that "[s]trong arguments can and will be made that immediate action to relieve Penn Central of the foregoing excessive service and labor obligations is the best course to follow." The Trustees rejected these arguments as impractical, instead looking to the projected but wholly unpromised government aid.[17]
In early February 1973 the Trustees, having exhausted procedures under the Railway Labor Act, made a reduction in the size of train crew consists. This resulted in a strike of operating employees on February 8. Congress stepped in with a Joint Resolution, P.L. 93-5, 87 Stat. 5, approved February 9, 1973. Taking note of the Trustees' views that "a massive infusion of Federal financial assistance would be needed" in any event and that cessation of PC's operations even for a short period "may make it financially impossible to resume operations," Congress imposed a three-month freeze on the implementation of crew consist changes and directed the Secretary of Transportation to submit, within the short period of 45 days, a report which "provides a full and comprehensive plan for the preservation of essential rail transportation services in the Northeast section of the Nation ...."
These developments led the reorganization court to issue a Memorandum and Order on March 6, 1973, In re Penn Central Transportation Company, 355 F.Supp. 1343 (E.D.Pa.1973), "charting a future course for the reorganization proceeding which will be consistent with legal and constitutional requirements." Dealing with the question of erosion, the court said, id. at 1344,
the record justifies the conclusion that post-reorganization deferrals and unpaid administration claims have already eroded the Debtor's estate to the extent of about $500 million. . . . Under any view of the matter, it seems clear that the point of unconstitutionality is fast approaching, if it has not already arrived.
Judge Fullam concluded, id. at 1346,
I take judicial notice of the fact that the legislative and executive branches are now addressing themselves to these problems. ... It would obviously be premature, therefore, for this Court to *1361 make final determinations as to the future course of this reorganization proceeding on the basis of the existing legislative and regulatory framework. The legal and constitutional rights of the parties to this reorganization should be evaluated in the light of whatever changes Congress sees fit to enact.
By the same token, however, this Court cannot ignore the realities of the Debtor's situation. On the basis of the record to date, it appears highly doubtful that the Debtor could properly be permitted to continue to operate on its present basis beyond October 1, 1973.
Under the circumstances, I have concluded ... that a further hearing should be held on July 2, 1973, to permit a careful and realistic re-evaluation of the situation in the light of intervening events. At that hearing, the Trustees will be required to file either a feasible plan for reorganization of the Debtor, or their proposals for liquidation or other disposition of the enterprise.
Under the legislative prod of the Joint Resolution of February 9 and the judicial prod of Judge Fullam's opinion of March 6, 1973, Secretary of Transportation Brinegar submitted his report to Congress on March 26, 1973. It was a remarkable document, containing the gist of what was to become the Rail Act some nine months thereafter. The report proposed sweeping legislative reforms that would permit identification of necessary core rail services in the Northeast, streamlined procedures for abandonment of unnecessary lines, and formation of a new corporation to operate the redesigned system. The report stressed that "the time for action is short," calling attention to the hearing set by Judge Fullam for July 2 "to hear proposals either for a workable plan or the trustee's blueprint for liquidation," which would be "the Court's only legal recourse" if no plan was forthcoming. On the other hand, the Secretary thought that if Congress "acts expeditiously along the lines outlined in this report, we believe that the Court will have an alternative to liquidation that is better for all concerned and for the Nation as a whole." The Secretary promised promptly to submit proposed legislation.[18]
Congress speedily initiated hearings to consider proposals made by the Secretary and others. On June 21, 1973, Senator Magnuson, Chairman of the Senate Commerce Committee, Senator Hartke, Chairman of the Subcommittee on Surface Transportation, and Representative Staggers, Chairman of the House Interstate and Foreign Commerce Committee, joined in a letter advising Judge Fullam that the appropriate Congressional committees had "begun consideration of a number of legislative proposals which would, if enacted into law, provide relief to the railroads in bankruptcy proceedings in the Northeast" including "varying degrees of federal assistance in solving the crisis which now exists." The legislators expected action by Congress "sometime this summer or early fall."
On July 2, no legislation having been adopted, the PC Trustees requested authority from the reorganization court to submit to the ICC what was called a plan of reorganization. Under the plan, if aid from the federal or local governments or other sources to compensate for continued erosion was not forthcoming by October 1, all freight and passenger service was to cease on a schedule estimated at 10 weeks. The Trustees would temporarily preserve all assets which might be required if provision for continued rail services were to be made. During the first six months after approval of the plan, the Trustees would consider only those offers to purchase or lease rail properties that committed the offeror to continue or resume rail service; acceptance of any such offer was subject to approval by the court and the ICC.[19] After the end *1362 of the six-month period, rail assets for which no such offers had been made or for which such offers had been disapproved, would be scrapped and underlying real estate sold or otherwise disposed of, "unless the Court shall find that a particular sale can reasonably be expected to impair the ability of the Commission to approve the Completed Plan of reorganization for the Debtors." The Trustees might dispose of non-rail assets at any time, subject to the same condition. Thereafter, on a date nine months from approval of the plan,
the Trustees and the Debtors shall be relieved of all common carrier obligations in respect of all rail lines and operations of the Debtors, any state law or regulation to the contrary notwithstanding, including operations over all lines of railroad leased from corporations whether or not 50 percent of the voting stock is controlled directly or indirectly by the Debtors.
The liquidation was subject to a proviso, noted above, that,
If the Court shall, prior to October 1, 1973, have approved arrangements pursuant to which relief is forthcoming from the United States, other government authorities, or other sources to stop the erosion of the Debtors' estates, Penn Central shall continue to provide rail services in the manner approved by the Court for a period not to exceed 12 months from the date of such approval.
Overruling objections of stockholder interests and others which sought a 90-day extension of referral of the plan to the ICC in view of the pending legislative consideration, the court authorized submission of the Trustees' plan, and requested the ICC "to certify an approved plan of reorganization, or a preliminary step thereof" not later than October 1, 1973. In re Penn Central Transportation Company, 363 F.Supp. 1263, 1267 (E.D.Pa.1973).[20]
On September 28, 1973, the ICC filed its report rejecting the Trustees' and other plans. Penn Central Transportation Company Reorganization, 347 I.C.C. 45. A principal ground, probably erroneous,[21] was that a plan which provided for the sale of rail properties without assuring continued rail service was not cognizable under § 77. Id. *1363 at 79-85. On the other hand, the Commission was correct in pointing out that rejection of the plans left the court free to dismiss the reorganization proceeding pursuant to § 77(g). Id. at 85.
At a hearing before the reorganization court on October 12, the Interstate Commerce Commission, the Under Secretary of Transportation and, in a later submission, the Department of Justice urged that in view of the progress being made in Congress to develop new legislation, the court should not dismiss the reorganization proceedings, as the New Haven Trustee had requested,[22] but should fix a date for a later hearing. Although expressing some impatience at the delay, Judge Fullam deferred action on the proposals to dismiss the proceedings "pending action by Congress on the Rail Act." See In re Penn Central Transportation Company, 382 F.Supp. 856, 861 (E.D.Pa.1974). The latter became law on January 2, 1974.[23]
The scheme of the Act is described in detail in our opinion on the 180-Day Appeals, 384 F.Supp. at 904-10, and there is no need to repeat that here. It suffices at this point to say that the Rail Act required that the United States Railway Association (USRA) submit to Congress within 450 days a final system plan (FSP) providing for the conveyance to the Consolidated Rail Corporation (ConRail) or to solvent railroads of designated rail properties of those bankrupt estates which were not reorganizable on an income basis; that the FSP should be deemed approved by Congress unless within 60 calendar days of continuous session after submission, either house of Congress passed a resolution of disfavor (in which event USRA was to submit a revised plan to which similar procedures would apply); and that conveyances should take place within 110 days after the FSP became effective. This expeditious program was altered in only two significant respects. Because of delay by President Nixon in appointing the board of USRA, Congress extended the date for the submission of the FSP from 450 to 570 days, 88 Stat. 1464. The FSP, a most impressive document on any view, was submitted on July 26, 1975. Neither house of Congress exercised a veto, and the FSP became effective on November 9, 1975. Meanwhile it had become apparent that the Rail Act required amendment in many particulars. Congress embodied these amendments in Title VI of the Railroad Revitalization and Regulatory Reform Act of 1976, 90 Stat. 31. This approved the FSP as modified by USRA's supplemental report dated September 18, 1975 and the official errata supplement dated December 1, 1975; permitted certain further designations to be made within 20 days; and fixed March 12, 1976 as the date for delivery by USRA to this court of a certified copy of the FSP with a resulting conveyance date of April 1.[24] The conveyances were made effective *1364 as of 12:01 a. m. on April 1, 1976; concededly any erosion of the conveyed properties ended at that time.

III. The Authorities

The recent recognition of the continued vitality of Brooks-Scanlon and its two companion cases, to which we have referred, should not obscure how limited those holdings were. The sole issue was the right of a railroad conceded to be a hopelessly losing one to cease operations rather than be obliged to continue indefinitely. There was no issue whether the railroad must first comply with applicable regulatory procedures before it became constitutionally entitled to stop operating.[25] Still less was there any suggestion that the railroads, or others like them, were entitled to be paid by the respective states for losses suffered between the time when they first manifested a desire to cease operations because of their losses and the date when operations ceased. The decisions simply upheld the claims of the railroads that they were entitled to cease operations as against the claims of state administrative agencies which were insisting on their continuance with attendant penalties for refusal to obey; the evident thought was that the owners' remedy for any wrongful action by administrative bodies lay in the courts.
Neither Brooks-Scanlon nor the two later cases raised a question concerning another related factor present in these proceedings  the responsibility of a bankruptcy court to bring a reorganization proceeding to an end if all hope of success has faded. Here the seminal case is Judge Frank's opinion in In re Third Avenue Transit Corp. v. Lehman, 198 F.2d 703 (2 Cir. 1952). This dealt with an application by the trustees of a local transit company in reorganization under Chapter X of the Bankruptcy Act to compel an indenture trustee to turn over proceeds from the sale of mortgaged assets for use in continuing operations. The court of appeals held that, in deciding to grant the application, the district court had not imposed sufficiently stringent tests of the necessity of obtaining the funds and their unavailability from other sources, and of the likelihood of successful reorganization so that the secured creditors would not suffer harm merely to benefit junior claimants. The court said, 198 F.2d at 707:
There are strict limits to the extent to which, in reorganization proceedings, the interests of creditors (or of a particular class of creditors) may be sacrificed to the public interest; to exceed those limits is (to say the least) to come dangerously close to the edge of unconstitutional taking of property, a line from which courts should keep away if possible. The reorganization judge should not compel a marked sacrifice of that kind, without first deciding, on substantial evidence, whether the interest of the creditors who would be affected by the sacrifice does not demand that prompt steps be taken to bring about abandonment of the utility's operations, including steps to procure the consent of those public authorities (if any) whose consent to abandonment is required. (Footnote omitted.)
There was no suggestion that the Chapter X trustees could ignore public authorities "whose consent to abandonment was required," still less that anyone was bound to *1365 pay for losses incurred while this was being obtained.[26]
The more recent line of cases begins with a statement in Penn Central Merger and N & W Inclusion Cases, 389 U.S. 486, 510-11, 88 S.Ct. 602, 614, 19 L.Ed.2d 723 (1968). The Court there rejected a contention of some New Haven bondholders that because of the erosion of the property of the New Haven, the Penn Central merger should be permitted to be consummated only if the New Haven were fully protected against further erosion. Mr. Justice Fortas said:
While the rights of the bondholders are entitled to respect, they do not command Procrustean measures. They certainly do not dictate that rail operations vital to the Nation be jettisoned despite the availability of a feasible alternative. The public interest is not merely a pawn to be sacrificed for the strategic purposes or protection of a class of security holders whose interests may or may not be served by the destructive move.
New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970), is the only case prior to the Rail Act in which a claim of entitlement to payment for something resembling unconstitutional erosion was pressed. While both sides rely heavily on this decision, in our view its import for these proceedings is considerably less than asserted by either.
While the Supreme Court denied the claim of the New Haven bondholders that the price to be paid by the Penn Central must include erosion of the New Haven's property for the five years before the valuation date, December 31, 1966, or at least for the two years between that date and actual inclusion, 399 U.S. at 492-93, 90 S.Ct. 2054, and some language in the opinion is favorable to the Government parties, the circumstances were quite different than here. The claim was being asserted not against the United States as having compelled continued operations but against a private company. Whoever was responsible for the New Haven's continuing in reorganization for seven years before inclusion in the Penn Central system, it was surely not the components of the Penn Central, which would have been pleased at all stages of the proceeding if the New Haven had simply gone away. Indeed no one had been responsible for the New Haven's continued operation in any blameworthy sense. The reorganization judge, Judge Anderson, had been acutely conscious of his responsibility to prevent a wastage of the assets of the New Haven security holders and had manifested his displeasure at the failure of state governments to be more constructive, see In re New York, New Haven and Hartford Railroad, 304 F.Supp. 793, 800-01 (D.Conn. 1969); New Haven Inclusion Cases, 399 U.S. at 465 n. 72, 90 S.Ct. 2054; he later stated that but for the prospects of inclusion of the New Haven in the Penn Central, he would have ordered abandonment applications to be filed in late 1963, 304 F.Supp. at 801. The trustee of the New Haven and almost everyone concerned with it had seen the Penn Central merger as both a peril and a promise, see In re New York, New Haven and Hartford Railroad, 378 F.2d 635, 636 (2 Cir. 1967), a peril because the merger would cause substantial diversion of traffic from the New Haven to the Penn Central and a promise because § 5(2)(d) of the Interstate Commerce Act empowered the ICC to insist on the New Haven's inclusion as a condition to approving the merger. The prospect of receiving marketable securities of what was widely heralded as a railroad with prospects *1366 of high financial success[27] was far more attractive than the uncertainties of liquidation in a region deprived of what had been its major rail carrier. Moreover, as the Supreme Court noted, 399 U.S. at 493, 90 S.Ct. at 2110, no application to the reorganization court to dismiss the reorganization proceedings and thus permit foreclosure of the mortgage liens was made until April 1967. As the Court said:
[T]he failure of the bondholders to press for early liquidation of the New Haven meant that their initial application for a dismissal of the reorganization proceedings came just as the objective of salvaging the New Haven appeared possible to achieve. As the reorganization court noted, only two of the several bondholder groups made that initial application; it was not joined by the trustees, nor was it endorsed by other representatives of the bondholders and creditors; and it came just as the Commission was about to certify a feasible plan of reorganization to the court.
Thus, the Supreme Court's approval of the erosion burden placed on the New Haven's estate would not be conclusive in a situation in which it was determined that the railroad or its bondholders had sought early dismissal of the reorganization proceeding or applications for abandonment and their claim for compensation lay against the government rather than an acquiring railroad.
On the other hand, we do not consider the Supreme Court's rejection of the proposal made by the ICC in its Fourth Supplemental Report, 334 I.C.C. 25, 58-60 (1968), that the liquidation value of the New Haven as of December 31, 1966, should be reduced by custodial costs, real estate taxes and discount for a year, which the Commission assumed would have been required to obtain a certificate of abandonment, to be so helpful to the transferors' claims to pre-conveyance CUE as they contend. Indeed, it cuts rather the other way. The Court said of the dispute between the Commission and PC on the one hand and the bondholders on the other, 399 U.S. at 461, 90 S.Ct. at 2094:
It does not draw into question the right of the Commission to insist that New Haven obtain permission to abandon its operations: no one here quarrels with the proposition that in the event of a liquidation, New Haven would have been obliged to obtain a certificate from the Commission pursuant to § 1(18) of the Interstate Commerce Act. The parties agree that since a delay occasioned by abandonment proceedings before the Commission, followed by judicial review, inheres in the liquidation process, the Commission may exercise its expertise in gauging the extent and expense of such a delay, and Penn Central need not pay for the consequent diminution in the value of the assets of the debtor.
The Court rejected the proposed adjustment essentially because it amounted to double counting.[28] The Court accepted, 399 U.S. at 463, 90 S.Ct. 2054, Judge Anderson's finding that the valuation date, December 31, 1966, represented not the date when he would have authorized the New Haven Trustees to seek a certificate of abandonment but the date when they would have had one, since he would have directed application to be made late in 1963 if the solution of inclusion in the Penn Central, far preferable in the public interest, had not been available. Here there is no showing *1367 that anyone before 1973 asked the PC reorganization court to require the Trustees to seek abandonment or sale of the PC;[29] nor was there any point before 1973 when the reorganization judge concluded, as did Judge Anderson in 1963, that the railroad was not reorganizable on an income basis and that the reorganization proceeding would be continued solely to allow alternative arrangements to be worked out.[30]
*1368 Continuing with the authorities, we next encounter In re Central Railroad of New Jersey, 485 F.2d 208 (3 Cir. 1973) (en banc), cert. denied, Timpany v. New Jersey, 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974). Dealing with a railroad that had been in reorganization since 1967 with substantial operating losses in each year, see 485 F.2d at 222 n.18 (dissenting opinion) and a continuing erosion of assets estimated at $1 million per month, id. at 226, the court put the following question, id. at 209:
May a district judge presiding over a railroad reorganization, pursuant to Section 77 of the Bankruptcy Act, permit the Trustees of the railroad to discontinue a loss-producing service or must he withhold his authorization until the Trustees have applied to federal or state regulatory agencies for permission to terminate the service? (Footnote omitted.)
The majority answered that the Trustees must at least apply. "There having been no application made, there can be no showing that delay or frustration would be the inevitable result," 485 F.2d at 213 (footnotes omitted).[31]
In our decision on the 180-Day Appeals, we said that while the Brooks-Scanlon doctrine remained unimpaired, it had been qualified in two ways. We described the qualification here pertinent as follows, 384 F.Supp. at 919:
This is that liquidation cannot commence until public bodies, acting under statutory authority, have had a reasonable *1369 opportunity to consider and act upon the proposed abandonment, as § 77(o) prescribes with respect to the ICC. This is true even when the Constitution requires that a certificate of abandonment must ultimately issue, since such proceedings give other parties, notably public authorities, a final opportunity to come up with plans that may prevent serious injury to the public interest.
Finally, there is the brief discussion in Regional Rail Reorganization Act Cases, 419 U.S. at 122-25, 95 S.Ct. 335. The discussion was directed mainly to showing the need for determining the applicability of the Tucker Act. It says only that the processes of the Rail Act, especially the possibility noted in the Government's reply brief in the Supreme Court, that "Congress could, in theory, successively disapprove several proposed final system plans," 419 U.S. at 123, 95 S.Ct. at 348, might result in an erosion taking, not that they would.
It scarcely needs to be added that enactment of the RRRRA, which authorizes this court to take account of compensable unconstitutional erosion, carried no implication that Congress thought this had occurred and affirmatively desired us to make a pre-conveyance CUE award. Such thoughts as Congress had, while of course not binding us with respect to constitutional questions, were to the contrary. See Senate Conference Rep. No. 595, 94th Cong., 2d Sess. 205 (1976), as corrected 122 Cong.Rec. S749 (daily ed., January 28, 1976) (clerical corrections), U.S.Code Cong. & Admin.News 1976, p. 220:
Considering substantial benefits conferred by the Rail Act it seems unlikely that any alleged compensable unconstitutional erosion arising from the operation of the Rail Act will be provable ... There is no intention even remotely to imply that there may be merit in a claim for pre-Act erosion, or indeed for any erosion.

IV. When did CUE begin to accrue  in general and with respect to the Penn Central

The PC Trustees do not dispute that the mere fact that a railroad, even one in reorganization, is in a hopelessly losing position does not entitle it to quit operations immediately in the face of statutes requiring approval of such cessation by federal or state regulatory agencies; they concede there is no "taking" until government has had a reasonable opportunity to make alternative arrangements for the carrying on of such public service as is found to be needed. Their position rather is that government  both federal and state  was placed on notice of the PC's plight as early as the Trustees' report of February 10, 1971; that the period of some 32 months from then until October 1, 1973, was more than a reasonable time for government to develop solutions; and that an erosion taking began on that date. The Government parties answer that the early reports of the PC Trustees were nowhere so foreboding as they now assert; that the Trustees made few proposals sufficiently definite to call for action by an agency of the Government and did not pursue the proposals in appropriate proceedings; that despite all the general talk about need for rationalization of plant the PC Trustees made no applications to the ICC for large-scale abandonments;[32] that no application to dismiss the reorganization proceedings was ever made by them and no such application was made by anyone else until the New Haven Trustee's application of October 9, 1973; that the first clear intimation that the reorganization of PC on an income basis would require infusion of federal funds was not made until January 1, 1973 and not quantified until February 1, 1973; and that even if the events of February and March 1973 were to be taken as starting the clock running for a responsible *1370 governmental answer  and they insist that no earlier date could reasonably be found  the federal government acted with speed that was not merely reasonable but remarkable in light of the complexities of the situation, with the result that PC was relieved of its common carrier responsibilities far sooner, and on a much more advantageous basis, than if the Trustees had filed applications for abandonment or sales in the winter of 1973 and ultimately had to endeavor to dispose of PC's rail properties.
Our first observation is the obvious one that a § 77 trustee is as much subject to § 1(18) [now slightly amended as § 1a(1)] of the Interstate Commerce Act forbidding abandonment of a line of railroad or the operation thereof without approval of the ICC as the railroad itself would have been. Smith v. Hoboken Railroad, W&S Connecting Company, 328 U.S. 123, 130, 66 S.Ct. 947, 90 L.Ed. 1123 (1946). We assume the same is true under most state regulatory statutes. Cf. Palmer v. Massachusetts, 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. 93 (1939).
A second observation is that § 1(18) requires Commission approval for a voluntary cessation of all operations which is intended to be permanent and not merely for the tearing up of a line. The statute speaks of abandonment either of "all or any portion of a line of railroad" or "the operation thereof"; if the disjunctive language left any room for doubt that voluntary cessation of all operations on a basis intended to be permanent constitutes an abandonment, Smith v. Hoboken Railroad, W&S Connecting Company, supra, 328 U.S. at 130, 66 S.Ct. 947, and Thompson v. Texas Mexican Railway, 328 U.S. 134, 144-45, 66 S.Ct. 937, 90 L.Ed. 1132 (1946), would remove it.
A third proposition is that § 1(18) does not cease to be applicable merely because serious erosion of the property of a railroad is taking place. As indicated, the railroads in Brooks-Scanlon, Bullock, and Eastern Texas had been through all administrative processes that were required. Despite the desperate situation of the New Haven, which had experienced net operating losses for four and a half years before invoking § 77, see New York, New Haven, and Hartford Railroad Discontinuance of Trains, 327 I.C.C. 151, 166 (1966), and by 1963 had no prospect for a successful reorganization on the basis of capitalized earnings, see In re New York, New Haven and Hartford Railroad, 289 F.Supp. 451, 456 (D.Conn.1968), Judge Anderson considered that authorization to abandon would have had to be obtained from the Interstate Commerce Commission, In re New York, New Haven and Hartford Railroad, 304 F.Supp. at 801;[33] as shown above, the Supreme Court rejected the Commission's proposal to take account of an additional year to obtain such authority not because it thought that this was not needed, but because Judge Anderson had already taken into account a reasonable period for obtaining it. 399 U.S. at 463, 90 S.Ct. 2054. Again, as noted in Section III of this opinion, our own decision on the 180-Day Appeals held that the Brooks-Scanlon principle had been qualified by requiring compliance with reasonable requirements for administrative approval; perhaps it would have been more accurate to say that the Brooks-Scanlon doctrine needed no such qualification since the administrative process had been exhausted in that case and its two early companions. See also New York, New Haven and Hartford Railroad First Mortgage 4% Bondholders' Committee v. United States, 305 F.Supp. at 1055; In re *1371 Central Railroad of New Jersey, 485 F.2d at 215. The validity of this third proposition is in no way impaired by decisions, stemming from the Third Avenue Transit case, supra, 198 F.2d 703, that a reorganization court cannot properly impair liens by such measures as approving the issuance of trustees' or receivers' certificates or authorizing use of the proceeds of sale of mortgaged properties for operations when the prospect of successful reorganization has disappeared, but instead must direct a trustee to apply for abandonment.
Apart from authority we see no basis in principle for holding that application of the abandonment provisions of § 1(18) to a debtor for whom a successful § 77 reorganization is no longer possible constitutes a taking of the portion of the estate eroded during a reasonable period required to obtain the needed abandonment authority in a proceeding which enables the Government to explore and develop alternative solutions. Although there is "no set formula to determine where regulation ends and taking begins," Goldblatt v. Town of Hempstead, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962), see Pennsylvania Coal Company v. Mahon, 260 U.S. 393, 416, 43 S.Ct. 158, 67 L.Ed. 322 (1922); Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv.L.Rev. 1165, 1249 (1967); Ackerman, Private Property and the Constitution 244 (1977), we have no doubt that requiring even a hopelessly losing railroad to obtain administrative permission for abandonment falls on the regulatory side. The building and operation of a railroad are not merely an added service to persons already on the scene so that its withdrawal would leave them no worse off than they were before. The railroad attracts more people and more investment on the justified expectation that service will continue. As was eloquently said in The Minnesota Rate Cases, 230 U.S. 352, 452, 33 S.Ct. 729, 761, 57 L.Ed. 1511 (1913), in a somewhat different context:
The railroad has long been established; to it have been linked the activities of agriculture, industry and trade. Communities have long been dependent upon its service, and their growth and development have been conditioned upon the facilities it has provided. The uses of property in the communities which it serves are to a large degree determined by it. The values of property along its line largely depend upon its existence. It is an integral part of the communal life.
Those who invest in a railroad in the face of statutes prohibiting abandonment without administrative approval do so with the knowledge that operation cannot cease immediately merely because it has become unprofitable and the investors might be better off if the railroad were liquidated forthwith. To be sure, no matter how profitable it may have been in the past, a railroad cannot be compelled to operate indefinitely at a loss. But Congress may constitutionally require, without thereby engaging in a taking, that operations continue until a certificate of abandonment has been obtained through proceedings conducted by an administrative agency with reasonable promptness.
A fourth proposition is that when Congress has specified a particular procedure, namely, application to the ICC, for obtaining authority to abandon, a railroad or its trustee cannot opt out from the statutory requirement in favor of other procedures which they consider just as good. We therefore reject the argument that interim reports of the PC Trustees, some more gloomy, some less so, served the office of applications to abandon and started the running of the clock for the Government to make an effective response. An application to abandon all or a large part of the operations of the Penn Central would have constituted sharp notice both to the tribunal designated by Congress to exercise "fostering guardianship and control" over the railroads, Dayton-Goose Creek Railway v. United States, 263 U.S. 456, 478, 44 S.Ct. 169, 68 L.Ed. 388 (1924), and to Congress itself, altogether different in nature and probable effect from reports of the PC Trustees to the reorganization court even though the reports were fully known to the Interstate *1372 Commerce Commission. The Commission is legally bound to act on applications filed with it, not on conditions made known to it, however desirable that might be. It simply will not do to say that the condition of the bankrupt railroads in the Northeast had reached such a pass that the ICC was no longer a factor. Section 1(18) of the Interstate Commerce Act stood in the early 1970's as it had since 1920, and the PC Trustees were not relieved of compliance by their view that the crisis called for action beyond the Commission's powers.[34] We reaffirm the statement in our opinion in the 180-Day Appeals that "even when the Constitution requires that a certificate of abandonment must ultimately issue, . . . such proceedings give other parties, notably public authorities, a final opportunity to come up with plans that may prevent serious injury to the public interest." 384 F.Supp. at 919. Among such "public authorities" is the Government of the United States. If the PC Trustees had applied to the Commission for authority to abandon in 1971 or 1972, the Rail Act might have been enacted and the conveyances consummated much sooner. They are not entitled to be treated as if they had done what, for one reason or another,[35] they failed to do.
Passing for the moment the important issue of "cashlessness," we therefore cannot accept the oft-iterated claims of the PC and other trustees that, as they put it, their "Brooks-Scanlon rights" had "accrued" by October 1, 1973, and a fortiori by January 3, 1974, so that despite the absence of proceedings seeking authority to abandon, any further operations must be deemed to have been for the account of the federal government. The error in this contention is that nothing in Brooks-Scanlon or any other decision of the Supreme Court or of this court indicates that a right to cease operations "accrues" to a losing railroad until it has complied with reasonable requirements for obtaining administrative approval of abandonment.
On the other hand, we believe enactment of the Rail Act should be taken as relieving the various trustees from any further obligation to apply for leave to abandon. As we pointed out in our decision on the 180-Day Appeals, 384 F.Supp. at 920-21 § 304(f) [now § 304(h)] prohibited abandonments unless authorized by USRA and "unless no affected State or local or regional transportation authority reasonably opposes such action," a standard which would permit few, if any, abandonments.
Indeed, we think there is justification for placing somewhat earlier the date when the various trustees (other than those of the Erie Lackawanna, see Section V(F) infra) should be treated prima facie as if they had applied for abandonment. The Trustees argue with force that the prospect of federal legislation during the last three quarters of 1973 made it idle for them to seek authority to apply for extensive abandonments and for reorganization courts to act on such petitions for leave to cease service as were presented to them, and also had an adverse impact on plans to make other dispositions of the properties. See New York, New Haven and Hartford Railroad 4% Bondholders' Committee, 305 F.Supp. at 1055-56.
*1373 To be sure, there is some inconsistency in the Trustees' saying on the one hand that Congress had a duty to act with respect to the railroad problem in the Northeast and on the other that its doing this in a careful and responsible way enhanced the liability of the United States for erosion claims. It could hardly be expected that the Rail Act would spring, like Athena, from the head of Zeus. The adverse effects of the nine months of legislative discussion, surely not an unduly long period for a measure as complex as the Rail Act, can be viewed as simply the price which the security holders of the bankrupt railroads must pay for living in a democratic society.[36]
However, the law does not compel the doing of a futile act and we are convinced that after Congress, on February 9, 1973, called on the Secretary of Transportation promptly to submit a report which "provides a full and comprehensive plan for the preservation of essential rail transportation services in the Northeast section of the nation," it was unrealistic to expect that a reorganization court would have authorized an application for large-scale abandonment  although Judge Fullam's order authorizing the PC Trustees to submit their reorganization plan to the ICC came close to that, or that the Commission would have devoted its resources to the processing of such an application. However, this means only that the PC Trustees and, in the absence of evidence pointing to a contrary conclusion, the trustees of other lines are to be treated as if they had applied for abandonment in February 1973  not as if during 1973 they had been denied permission to abandon or been forced to operate despite such permission.
We are convinced that in the case of the Penn Central it would have been impossible to complete abandonment proceedings before April 1, 1976, even if applications for all of Penn Central's trackage had been filed in February 1973 and the Commission had treated the applications, as it should have, as deserving the highest priority. Here was a railroad of more than 19,000 miles, operating in 14 states and the District of Columbia and having 1972 transportation revenues of $1,825,000,000. In our opinion on the 180-Day Appeals we reviewed the practical obstacles to the swift obtaining of permission for any large-scale abandonments, including those resulting from the need for the Commission's staff to prepare environmental impact statements, and concluded that "the chance of favorable action by the Commission on any large-scale abandonments within 620 days would have been exceedingly poor." 384 F.Supp. at 922. We now know that the situation would have been far more complex than we had envisioned in 1974 since it appears from the submissions made to us in other phases of this case that the PC Trustees would have sought approval of sales to other railroads and to state transportation authorities,[37] as well as abandonments. Sales to other railroads would have given rise to considerations of competitive effect which, with the best will in the world, would have taken many months of hearings and briefings to explore. We thus are confident that even if an application for permission to abandon had been filed in February 1973, it would have been impossible for the PC Trustees to have obtained authority to dispose  not to speak of actually disposing  of a major portion of the rail properties conveyed *1374 on April 1, 1976 prior to that date.[38] The fact that formulation of the Rail Act and elaboration and consummation of the FSP took the time that they did is almost sufficient proof of this. Neither Congress nor USRA was obliged to comply with NEPA or the Administrative Procedure Act, as the Commission would have been. Our concern in the 180-Day Appeals with respect to erosion was not over such a period, but over what then seemed a very real probability that at least one house of Congress would veto the initial version of the FSP, with consequent long delay while a revised plan was being formulated and resubmitted, 384 F.Supp. at 922, 925,[39] and a correspondingly long postponement of the conveyance date. This did not occur.
There is one important but limited caveat to our finding that abandonments of PC properties would not have taken place before April 1, 1976 even if applications had been filed early in 1973 and the Commission had proceeded with all possible diligence. While arguing that in general there was no pre-conveyance CUE, the Government parties suggested that we leave it open to the smaller railroads to attempt a showing that but for enactment of the Rail Act (to which we add the previous nine months of debate), *1375 they would have sought and could have obtained authority to abandon or transfer all their operations prior to the conveyance date and would have done so. Fairness seems to require that this opportunity be open to all transferors  not only to the smaller carriers, discussed in Section V infra, but also to the PC Trustees, and not only with respect to the whole of their operations but to truly significant parts.[40] Subject to the comments in Section VI of this opinion, we will allow such showings to be attempted.[41]
We say "attempt" since we agree with the Government parties that in view of the interdependence of the various railroads in the Northeast, the burden of demonstrating the probability of obtaining a final decision on and consummating major abandonments or sales before April 1, 1976, even with an assumed filing date as early as the winter of 1973, will be extremely heavy. In a non-Rail Act world, where the ICC would presumably have been faced with a request for abandonment or sale of thousands of miles of track from the Penn Central, not to speak of similar requests by other transferors, the difficulties in providing expedited settlement for any large number of lines would have been extremely grave. The solution which the ICC would have had to devise to the regional rail crisis would have involved a complex piece of regional planning, and we think it unlikely that the ICC would have tied its hands early in the proceeding by permitting abandonment or sale of major lines even before it knew what shape the surviving system might take. The abandonment application of a single line, even though it was a clearly losing operation, would often have significance for other abandonment applications. For instance, while an abandonment of line X-Y by bankrupt railroad A might be a clear case if service between X and Y were assured over bankrupt railroad B, the situation would stand differently if bankrupt railroad B also was seeking abandonment authority. In such a case, the Commission would have had to consider whether one of the roads might be able to operate profitably if relieved of competition by the other, and also to explore the possibility of obtaining service in other ways, whether through acquisition by another carrier or through sale to or subsidy by government. We thus find it likely that the abandonment or sale proceedings in the hypothetical world without a Rail Act, even if they began with separate applications by the various bankrupt railroads, would have involved a consolidated planning process very much like that engaged in by USRA in formulating the Final System Plan but with more time-consuming hearing requirements.
We thus come to the point we have passed so far. This is the contention of various trustees that but for the Rail Act, with its provisions, §§ 213 and 215, designed to keep the bankrupt carriers financially alive while the FSP was being formulated by USRA, submitted to Congress, and implemented, they would have run out of cash and would have been entitled to cease operations on that ground without federal or state administrative permission. Reliance *1376 is placed on footnote 31 to our opinion on the 180-Day Appeals, 384 F.Supp. at 919, saying that we assumed there would be no need to obtain approval of abandonments "if, after all reasonable efforts, a reorganization trustee was faced with an imminent depletion of cash that would make it impossible for him to pay current bills for wages, supplies, interline balances, and similar expenses, and still leave an amount sufficient to permit an orderly liquidation." This assumption rests on the basis that a carrier does not "abandon" what it is simply unable to do. Zirn v. Hanover Bank, 215 F.2d 63 (2 Cir. 1954); ICC v. Chicago, Rock Island and Pacific Railroad, 501 F.2d 908, 911 (8 Cir. 1974), cert. denied, 420 U.S. 972, 95 S.Ct. 1393, 43 L.Ed.2d 652 (1975).
The PC Trustees contend that but for the Rail Act they would have reached this point of "cashlessness" in February 1974. In fact, that did not occur in their case or any other because a combination of the carriers' own resources and $557 million in Government funds provided under §§ 213 and 215 of the Rail Act[42] prevented any of the *1377 estates from reaching the point of cash depletion before the conveyance on April 1, 1976.
While it may seem conceptually difficult to characterize a government grant as giving rise to a claim for just compensation on a taking, the point is more troubling than might appear at first blush since the advances did prevent abandonments that otherwise could lawfully have occurred. The Government parties themselves recognize that the argument cannot be pressed to the extreme that erosion claims could be forever avoided by spooning out enough cash to *1378 enable a carrier to pay the most necessitous items such as bills for wages, supplies, interline balances, and installments on equipment obligations, while letting other priority items, notably state and local property taxes, continue to accrue. Their position is limited to what they and we consider the situation here, where generally speaking the conveyances occurred within a reasonable time after the beginning of serious discussion of the Rail Act, as measured by the time that would have properly been consumed if applications for abandonment or sale had then been filed. Under such circumstances we do not think the trustees can insist that they had a constitutional right to avoid government cash advances necessary to keep the railroads alive for such a reasonable time as was necessary to effect a solution that would maintain the essential rail services which the Northeastern railroads had conducted long and, until recent years, profitably. It was not until the winter of 1973 that any of the trustees or reorganization judges sounded the clear notes of warning that led to enactment of the Rail Act; we perceive no taking in Congress' having found means to keep the railroads running for a reasonable period while a solution was being devised, submitted to Congress, and consummated.[43] As previously indicated, we will allow a transferor to attempt to show that, but for the Rail Act and the discussions leading up to it, it should have been able to conclude proceedings for abandonment or sale, and to discontinue operations, prior to April 1, 1976; providing a railroad with sufficient cash to see it through such a period is not an unconstitutional taking.
While we attach no importance to the fact that §§ 213 and 215 funds were advanced only on application by the trustees, we cannot accept the now prevalent characterization of the Rail Act by the bankrupt estates as something forced by Congress on unwilling victims. In pleading at the 1973 House hearings for government action that would resolve the conflict between the interests of the public and the owners, Jervis Langdon, Jr., a PC Trustee with long railroad experience, noted that "in the absence of such a resolution, we must go down the uncertain path of liquidating an enterprise of unprecedented size and importance."[44] To be sure, Mr. Langdon was advocating a solution in which erosion would be stemmed from the date of enactment of the new statute. But we believe that if a referendum had been taken among the security holders, a large majority would have preferred the solution afforded by the Rail Act  especially as that was improved by the RRRRA in 1976 through the provision of certificates of value carrying the full faith and credit of the United States for any shortfall between the value of ConRail securities and the net liquidation value (taking account of CUE and VOB) of the properties conveyedto the "uncertain *1379 path" of liquidation.[45] We find it unlikely that any responsible railroad interests wanted, or expected, liquidation; such opposition as there was to the Rail Act was founded rather on the hope that, faced with a cessation of operations, particularly by the PC, Congress would do something even better for the railroads. We decline to rule that the Fifth Amendment requires such an essay in brinksmanship.[46]
In sum, subject to the caveat noted above concerning supported showings of "pre-conveyance date" abandonment or sale in a non-Rail Act world, and the reservation with respect to administrative claims noted in the next section of this opinion, we are thus of the view that PC suffered no preconveyance CUE.[47]

V. The Cases Other Than Penn Central

In this section of the opinion we shall deal with arguments of the smaller roads, most of which contend that their claims for pre-conveyance CUE are even stronger than Penn Central's.[48]
Before going into specifics, we note that the Government parties, while generally denying the existence of pre-conveyance CUE, have suggested that we might leave two points open for later decision. One, to which we have already referred, is that a railroad might be entitled to pre-conveyance CUE if it could show that but for the Rail Act (a concept we would enlarge to include the effect of the discussions that began in February 1973 leading to its passage), it would have filed for abandonment[49] and should have been able, with the *1380 exercise of reasonable diligence by the Government authorities, to procure a decision thereon and carry out the abandonment before April 1, 1976. The other is that pre-conveyance CUE might exist if it should develop, in the language of counsel for the Government parties (Transcript of argument, 124) "that a person who extended credit to the railroad during the time it was subject to the administration of a Reorganization Court may have relied upon the authority of the Court as guaranteeing that its administration claim would be paid in full,"[50] and should ultimately find such reliance to have been unjustified. For reasons indicated in Section IV, we consider the first reservation (also expanded to include sales) to be a necessary one; we shall also leave the second point open as the Government parties suggest, since we may never need to decide it if the ultimate valuation is sufficient to cover such claims.

A. Central Railroad Company of New Jersey (CNJ)

Of the debtors involved in these proceedings, only the CNJ had initiated reorganization proceedings before PC, to wit, on March 22, 1967. CNJ was atypical in several respects. It carried a burden of commuter passenger traffic in the northern New Jersey metropolitan area which was huge in comparison with its total operations; its freight services were almost entirely those of a terminating or originating carrier; and we are told that its divisions with longerhaul carriers moving the traffic from and to the west were unfavorable  particularly the divisions in the Wilkes-Barre  Scranton, Pa., area. As early as November 27, 1970, Manufacturers Hanover Trust Co., Indenture Trustee of CNJ's General Mortgage Bonds, filed a petition requiring parties in interest to show cause why the reorganization proceeding should not be dismissed; the court referred this to the ICC for recommendation as required by § 77(g) of the Bankruptcy Act. No action was ever taken by the Commission but the Indenture Trustee took no proceedings to compel this.
For reasons unnecessary to detail, the Trustee initially appointed for the CNJ resigned; the present Trustee, Mr. Timpany, took office in January 1971. He developed a plan outlined in a letter dated March 6, 1971 to the Administrator of the Federal Railroad Administration, which came to be known as a Blueprint for Survival. This included transformation of the CNJ largely into an originating and terminating road serving the northern New Jersey metropolitan area, elimination of its Pennsylvania operations through transfers to other roads which they largely paralleled, sales or abandonments of other portions of the line, discontinuance of a portion of the lighterage service in New York Harbor, revision of CNJ's passenger service contract with the State of New Jersey so that this would cover all costs rather than merely avoidable costs, and sale of a bridge over Newark Bay to The Port of New York Authority which would reimburse CNJ for additional expense in routing traffic over the lines of other carriers. The letter concluded on an optimistic note and constituted the basis for an application for $10 million in federally guaranteed loans under the Emergency Rail Services Act of 1970.
On March 24, 1971, the Secretary of Transportation issued his findings on the Trustee's application which he determined to grant in the amount of $6 million. As required by § 3(a) of the 1970 Act, the Secretary found that cessation of essential transportation services by the CNJ would endanger the public welfare; that cessation of such services was imminent; that issuance of federally guaranteed trustee certificates was the only practicable means of obtaining funds to meet payroll and other expenses needed to provide such services; that the CNJ "can reasonably be expected to become self-sustaining"; and that the probable value of its assets in the event of liquidation afforded reasonable protection to the United States.
*1381 The Trustee's application to the reorganization court for authority to issue the certificates was opposed by bondholders. The reorganization judge, Judge Augelli, granted the petition on March 22, 1971, finding that "with the help of the new money, a successful reorganization is indeed feasible and that such reorganization will be effected within a reasonable time." The bondholders did not appeal.
The substantial complaints of the CNJ Trustee begin at this point. There were delays in obtaining authority for abandonments; indeed the Trustee abandoned the Pennsylvania operations without administrative authorization pursuant to an order of the reorganization court permitting temporary suspension of operations pending ICC decision and cessation of operations if the ICC denied the application[51]  action sustained by a panel of the Third Circuit, 455 F.2d 989 (1972), in a per curiam decision which seems basically inconsistent with the later en banc decision, 3 Cir., 485 F.2d 208 (1973), cert. denied, 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974), refusing to allow abandonment of New Jersey passenger operations without application to the appropriate federal and state commissions.[52] The Commission did not fully grant other applications contemplated by the Blueprint, see R. D. Timpany, Trustee of the Central Railroad Co. of New Jersey  Abandonment of Operation Between Phillipsburg, N.J. and Hudson, Pa., 342 I.C.C. 227 (1972); Routing via Oak Island Jct., New Jersey, 341 I.C.C. 129 (1972), some of which were opposed by other roads,[53] but the Trustee did not seek judicial review.[54] The ICC failed to act on applications filed on July 13, 1972, F.D. No. 27145, and December 13, 1972, F.D. No. 27265, for authority to use the Penn Central's Newark Bay Bridge and to provide for major consolidation in the northern New Jersey metropolitan area; the Commission also suspended tariffs providing for a surcharge designed to increase freight revenues by 20%, I & S Docket No. 8932, and declared agreements with shippers to increase revenues to be illegal, Contract Service Charges Between New Jersey Points, I & S Docket No. 8702. The State of New Jersey did not enter into the full cost of service passenger contract for which the Trustee had hoped.
Meanwhile, in May 1972 the Indenture Trustee had moved for an order directing the termination of all CNJ's operations on the ground that continued operations had become unconstitutional. The Reorganization Trustee and a Bondholders' Protective Committee opposed this, pointing to various favorable developments. On December 8, the court refused to take this "drastic step" on what it considered an insufficient record, indicating that it did not think "the constitutional line" as to erosion had then been passed. There was no appeal. Shortly thereafter the court did direct cessation of New Jersey passenger service effective January *1382 21, 1973 in the absence of a new contract with the State, saying that without a full compensation agreement "we will run into an erosion of assets that will result in an unconstitutional taking of the debtor's property." This was the order which, after affirmance by a panel, was reversed in August 1973 by the Third Circuit in the en banc opinion to which we have often referred, 485 F.2d 208.
The Trustee contends that the beginning of Congressional discussion of the Rail Act in early 1973 brought to a halt many promising developments[55] including negotiations for a revised passenger contract with the State of New Jersey which had progressed while operations continued under an interim revised subsidy contract.[56] The Trustee advances as further evidence of the adverse effect of the Rail Act that after Judge Augelli had ruled that the CNJ could not be reorganized under the Rail Act, the State negotiated a greatly improved subsidy contract, from which it turned back after our reversal of the reorganization court's ruling. Finally the Trustee refers to various proceedings during the early part of 1976 before the reorganization court (now Chief Judge Whipple) with respect to the payment of interline balances and other current claims. These culminated in an opinion and order dated March 31, 1976, which directed payment of interline and certain other priority claims but deferred payment of other pre-conveyance administration expenses until the post-conveyance situation could be assessed. We think it best to defer consideration of this last group of contentions until we have a clearer statement of just what the Trustee claims and what the Government parties respond; it may be that all this is a matter for the reorganization court and the Third Circuit rather than for us.
We do not see how any of this entitles the CNJ to more favorable treatment on the issue of when the period for government action should have begun than what we have recognized to be proper in the case of PC. The CNJ's having entered reorganization more than three years before PC is inconsequential; as late as March 22, 1971, the reorganization court found that the CNJ was reorganizable on an income basis if the Trustee's program was carried out and the creditors took no appeal. While the Indenture Trustee sought to have operations cease in December 1972, the reorganization court found that the Indenture Trustee had failed to show that such cessation was constitutionally required, and no appeal was pursued. The Trustee has made a rather impressive showing that Congress' consideration and enactment of the Rail Act had a particularly negative effect on the CNJ; but we give full weight to that by allowing him to prove, if he can, that but for discussion of the Rail Act he would have initiated proceedings for abandonment or sale in February 1973 and that these should have been concluded and the transaction consummated before April 1, 1976. The other reservation proposed by the Government parties will answer fears expressed by the Trustee that if we should adopt the valuation theory of the Government parties, which he challenges, the estate may not be able to pay administration expenses.

B. Reading Company

A principal basis on which the Trustees of the Reading contend that it has a special entitlement to pre-conveyance CUE is that it was doomed by the Penn Central merger, as a result of which it lost revenues on traffic previously interchanged with the New York Central at Newberry Junction, *1383 Pa. and other points. The course taken by the Reading, long a "family line" of the Baltimore & Ohio, in not obtaining inclusion in the B&O-Chessie System at the time of that merger, opposing the Penn Central merger, or, until belatedly, even seeking special protective conditions, has been the subject of previous judicial comment. See Erie-Lackawanna Railroad v. United States, 279 F.Supp. 316, 330-32 (S.D.N.Y. 1967), modified and aff'd, Penn Central Merger and N & W Inclusion Cases, 389 U.S. 486, 519-20, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968). Despite the losses from the PC merger the Reading did not enter reorganization until November 23, 1971.
In May and June, 1973, the Institutional Investors Reading Group filed a petition and amended petition. The latter asked the court to fix October 5, 1973 as the date by which the Trustees should file either a plan of reorganization for continued rail service or a plan of liquidation,[57] and January 4, 1974 as the date on which all rail operation would cease unless a plan of reorganization had been filed before October 5 and the court should have determined before November 2 that reorganization pursuant to the plan was feasible. The Reorganization Trustees opposed this, pointing to such things as prospects for increased "piggy-back" and coal carriage on account of the energy crisis, various cost reduction and revenue improvement efforts, as well as the possibility of federal legislative response to the Northeast rail situation. An affidavit of J. R. Greene, Vice President-Finance, prophesied that available cash would double from $2.6 million on July 31 to $5.0 million on December 31, 1973. He pointed to other favorable prospects, including a shift of freight traffic from the Penn Central line serving the Washington-New York-Boston passenger "corridor" to alternate routes of the B&O and the Reading. He also referred to the legislative proposals then pending before Congress and to the benefits the Reading would derive from them. Hearings were held on August 1 and 2. Alfred W. Hesse, Jr., Vice President-Law, testified to the difficulty in formulating a plan in light of the legislative uncertainties, stating that in his opinion the Reading would be included in the proposed restructuring of the Northeast roads. He added that each of the bills arguably provided for protection of the estates during the period in which cessation of operations was to be forbidden. He thought that in the absence of legislation "about October 1" would be the date when the Trustees would "begin the works" of seeking a cessation of service. Although a recent affidavit of Mr. Hesse states that this would have led to cessation of operations on December 1, 1973, the affidavit does not explain how this could lawfully have been accomplished. Apparently the court took no action on the investors' petition.
In contending that CUE began to accrue on December 1, 1973, if not before, the Reading Trustees, like the PC Trustees and the CNJ Trustee, simply ignore the provisions of § 77(g) that the reorganization judge must obtain a recommendation from the ICC before dismissing a proceeding and of § 1(18) of the Interstate Commerce Act requiring the Commission's approval of abandonment.[58] The utmost the Reading Trustees can derive from the record here presented is that, absent discussion of the Rail Act, it would have become the duty of the reorganization court late in 1973 to direct that steps be taken that would permit a lawful cessation of operations.[59] As *1384 against this, in the presentation before Judge Ditter in the proceedings under § 207(b) of the Rail Act, the Reading Trustees forecasted negative net railway operating income of only $1.55 million for 1974 and positive net railway operating income of $3.6 million for 1975. In the Matter of Reading Company, 378 F.Supp. 474, 476 (E.D.Pa.1974). While the judge regarded these figures as "overly optimistic," id. at 479, his main reason for finding that the Reading was not reorganizable on an income basis was the competition it would face from ConRail and the disappearance of the projected Mid-Atlantic Railroad Company (MARC) as a realistic probability in light of the Rail Act.[60]
The Reading's case for pre-conveyance CUE is thus weaker than PC's or CNJ's. We see no reason to give it the benefit of the assumption that but for the discussion of the Rail Act, it would have filed for abandonment in February, 1973; the earliest date supported by the record for such a hypothetical filing is October 1973. We leave it open to the Reading Trustees to prove, if they think they can, that a petition for abandonment or sale filed in late 1973 should have been acted upon and the transaction consummated before April 1, 1976.

C. The Lehigh Valley

The case of the Lehigh Valley (LV) Trustees is much more appealing. As early as July 24, 1972, the Trustees filed a "General Plan for Reorganization" in which they concluded that reorganization of the LV as then configured on an income basis was impossible and that successful reorganization depended on a consolidation of its facilities with those of the Reading and the CNJ. However, it became apparent as a result of cash shortages that this plan could not be carried out, and on March 13, 1973, the Trustees filed a petition with the reorganization court (Judge Fullam) for leave to cease operations on October 1, 1973, unless the court should find prior to September 1 that an income based reorganization was "probably feasible and can be consummated within a reasonable period of time consistent with the creditors constitutional rights." Like other petitions to which we have referred, this one seems to have assumed that § 1(18) of the Interstate Commerce Act had no application. A hearing was held in June 1973. Judge Fullam deferred ruling "[i]n view of the imminent prospect of legislation . . .." In re Lehigh Valley Railroad, 382 F.Supp. 842, 844 (E.D.Pa.1974) (opinion under § 207(b) of the Rail Act).
The LV Trustee is entitled to endeavor to establish that but for the discussion of the Rail Act he should and would have filed for abandonment or sale early in 1973, and to prove that such an application should have *1385 been acted upon and the transaction consummated before April 1, 1976.[61]

D. The Lehigh & Hudson River Railroad

The Lehigh & Hudson River Railroad (L&HR) is a small bridge carrier[62] operating between points in Pennsylvania where it connected with the PC and LV and Maybrook, N.Y., where it connected with the New Haven. After inclusion of the New Haven in the PC system, the PC diverted much New England traffic formerly handled over the L&HR to its route on the west bank of the Hudson River to Albany and thence over the former New York Central line into New England. Because of this loss of traffic the L&HR filed for reorganization in the Southern District of New York in April 1972.
After having borrowed $200,000 secured by a chattel mortgage on four locomotives,[63] the Trustee, on July 9, 1973, filed a petition with the reorganization court (Judge Ward) for an order directing cessation of operations no later than October 1, 1973, unless a finding should be made by the court prior to September 1, 1973, that "an income based plan of reorganization is probably feasible and can be consummated within a reasonable period of time consistent with the creditors' constitutional rights." The petition indicated doubt as to the Trustee's being able to meet payrolls after October 1. Hearings were held on July 26 and 27. Counsel for the United States neither supported nor opposed the petition; he thought "temporary" cessation of operations might not require ICC approval and asked only that the track be left in place. The court took no action in light of the probable enactment of the Rail Act.
The L&HR Trustee has made out a case for taking July 31, 1973 as the date by which an application for abandonment or sale would have been made but for the pendency of the Rail Act. Also, in view of the small size of this carrier and the predominantly bridge character of its traffic, he may have a better chance than most to show that a reasonable time for action by the ICC would have expired and the transaction would have been consummated before April 1, 1976.

E. The Ann Arbor Railroad Company

The Ann Arbor Railroad, a subsidiary of the Detroit, Toledo & Ironton Railroad Company (DT&I), extends in a northwesterly direction from Toledo, Ohio, through Michigan, to Lake Michigan, across which it operated car ferries to terminals on the Wisconsin side of the lake. Two of these car ferry routes had been abandoned, with ICC approval, in 1968 and 1970. On June 19, 1972, the Ann Arbor filed a petition, FD-AB49, for authority to abandon the two remaining car ferry routes, between Frankfort, Michigan, and Manitowoc, Wisconsin, and between Frankfort, Michigan, and Kewaunee, Wisconsin, together with a connection 20.53 mile line of railroad between Thompsonville and Elberta, Michigan, plus a 1.87 mile spur from Elberta to Frankfort. The car ferry operations allegedly caused losses of more than $877,000 in 1970, $1,075,000 in 1971, and $1,330,000 in 1972, based on the ICC's "50-percent" rule used to estimate off-branch costs in ICC abandonment proceedings  a formula alleged to have the result of understating losses under the circumstances here presented. The ICC took no action on the petition because of the "freeze" it had imposed on abandonment applications after the district court decision in Harlem Valley Transportation Association v. Stafford, 360 F.Supp. 1057 (S.D.N.Y.1973), that the ICC staff must prepare an EIS where abandonment *1386 applications constituted "major Federal actions significantly affecting the quality of the human environment," see 42 U.S.C. § 4332(2)(C), during the course of an appeal to the Second Circuit, which affirmed on June 18, 1974, 500 F.2d 328.
By the time the freeze was lifted, see 384 F.Supp. at 921-22, Congress had enacted the Rail Act which transferred to USRA authority to permit abandonments of carriers being reorganized under the Rail Act but forbade the granting of permission to abandon if this was reasonably opposed by any affected State or local or regional transportation authority, § 304(f) [now § 304(h)]; both Michigan and Wisconsin opposed abandonment of the two car ferries. Meanwhile the Ann Arbor had filed on October 15, 1973 for reorganization under § 77 in the Eastern District of Michigan. We are told that although it had been hoped that if the Ann Arbor were shorn of its car ferry operation, it might show a profit, these hopes faded as 1973 progressed, and the reorganization court (Judge Pratt) found on July 1, 1974 with the assent of all parties that the Ann Arbor was not reorganizable on an income basis and should be reorganized under the Rail Act.
The Ann Arbor may well be entitled to preconveyance CUE with respect to erosion from operating the car ferries and the related mileage sought to be abandoned. The application, which made a strong showing of an unconstitutional deprivation, had been on file for a year and a half when the Rail Act was enacted; apparently the Ann Arbor was a victim of the ICC's action in unilaterally declaring a moratorium on the disposition of abandonment applications while the Harlem River litigation was in progress, or of the consideration of the Rail Act, or of both. The rest of the line stands differently. Here there is nothing to indicate that but for discussion of the Rail Act the Trustee would have sought abandonment as early as February 1973; apparently this might have been done sometime in the spring of 1974.

F. Erie Lackawanna Railway Company

The Erie Lackawanna Railway (EL) filed for reorganization under § 77 in the Northern District of Ohio on June 26, 1972. However, in proceedings during the spring of 1974, the reorganization court (Judge Krupansky) found in its Order No. 234 that EL was reorganizable on an income basis. Subsequent developments are recorded in our opinion of April 11, 1975, as follows, 404 F.Supp. 954, 955-56:
As a result of adverse economic developments unforeseen when the order (Order No. 234) was entered, EL failed to realize the results projected for 1974. On January 9, 1975, the EL Trustees announced their changed conclusion that EL was not reorganizable on an income basis under § 77 within a reasonable time and their intention to seek an amendment of RRRA that would permit EL to be brought under that Act, as it might initially have been. Less than a month later a number of EL's Indenture Trustees filed a petition in the district court for an order dismissing the § 77 proceeding in favor of an immediate equity receivership and fixing a date for cessation of operations. About the same time the EL Trustees filed a petition for authority to cease operations because of prospective lack of sufficient cash to meet payrolls and other bills; this petition was later withdrawn in light of the prospect of enactment of the amendatory legislation that would enable EL to be placed under RRRA, which the EL Trustees were seeking. The Trustees announced that if the amendment was adopted they would petition for reconsideration of Order No. 234; the Indenture Trustees sought unsuccessfully to enjoin this. On February 27, 1975, the district court began a hearing to consider the various matters that had been brought to its attention.
The amendment became law on the following day, 89 Stat. 7 (1975). The Trustees, on March 3, 1975, filed a petition asking the reorganization court to reconsider Order *1387 No. 234 and determine that reorganization should proceed under the Rail Act; they also petitioned for authority to enter into arrangements for emergency financial assistance under § 213. The court granted both petitions, and we affirm its decision on the former. The EL Trustees sought and received emergency assistance under §§ 213 and 215.[64]
Although the EL Trustees make more extreme claims, the main thrust of their position is and has to be that CUE began to accrue in January 1975 when they became aware of the seriously adverse change in their prospects of successful reorganization and the prospective exhaustion of cash. What we have said in regard to the case of the PC Trustees applies with still greater force to the EL Trustees. EL's decision to bring itself under the Rail Act simply started the clock running, and the conveyance date came less than 15 months after the EL Trustees made their plight known and secured the amendment of the Rail Act needed to allow EL to come under it.[65] We have already given our answer to the argument that but for the Rail Act the EL Trustees would have been freed from any requirement of securing § 1(18) approval by sheer impossibility; we do not think any CUE rights accrue if Congress provides the wherewithal to keep even such a railroad alive for what would have been no more than a reasonable period for the ICC's acting upon an abandonment application. In sum, unless the EL Trustees can show there were substantial pieces of their line for which but for the Rail Act petitions for abandonment or sale would have been filed in March 1975 and should have been acted upon so as to permit consummation before April 1, 1976, a showing we would think almost hopeless, they are not entitled to pre-conveyance CUE.

VI. Conclusion

We should not end this opinion without reference to a basic theme running through the briefs of almost all the trustees and investor interests which we have not discussed in express terms. This is that after a certain date, claimed (except in the case of the EL) to be certainly no later than January 2, 1974 and generally before, the bankrupt railroads were operated solely in the public interest and the Constitution, as construed in Brooks-Scanlon and other cases, requires the public to pay for losses incurred during that period.
Our discussion in Section IV was mainly directed to showing that even if the premise were sound, the conclusion would not follow since the Constitution does not require that a losing railroad be permitted to quit immediately even if its continued operations during administrative proceedings conducted with reasonable diligence served no private ends. We think also that the premise is highly questionable. With deep respect for the sincerity of counsel, we believe their concentration on maximizing claims for pre-conveyance CUE has produced a certain amount of myopia as to the parlous condition of these railroads in 1973. As we said in our opinion on the 180-Day Appeals, 384 F.Supp. at 917:
[T]here is a certain incongruity between the high demands which the investors make of the Act and the unhappy position they, or in any event most of them, occupied when it was enacted. The idea that billions of dollars of liquidation proceeds of these bankrupt railroads are lurking just around the corner is unrealistic in the last degree.
The prospect of having to liquidate these bankrupt estates in a region largely deprived of railroad service was scarcely enticing. *1388 The various trustees answer that this would not have happened, that if the respective reorganization courts had issued orders permitting a shut-down when cash available for operations had sunk to the level described in fn. 31 of our opinion on the 180-Day Appeals, 384 F.Supp. at 919, as they could lawfully have done, Congress would have stepped in with something  either outright condemnation or, alternatively, an interim take-over of the use of the roads with the Government shouldering all losses until a solution like the FSP could be devised and consummated. These, of course, are possibilities,[66] but no one in the dark days of 1973 could have been sure that either would materialize or what form they would take if they did. The Rail Act itself and the committee reports accompanying the House and Senate bills[67] afford evidence *1389 that Congress was not prepared to go so far so fast. The more likely response to imminent cessation because of cashlessness would have been the provision of further emergency assistance. Moreover, the possibility or even a probability that the federal government, had it been faced with an imminent shut-down, might have come up with something more favorable to the railroads than the Rail Act in erosion terms does not mean that erosion borne by the roads under the chosen solution constitutes a "taking"; the mere fact that the government chooses one alternative over another does not make it liable for the greater benefits the railroads would have realized from a choice it rejected or never had to consider.
As previously indicated, we are confident that, non constat the position of various indenture trustees who had to be conscious of their fiduciary responsibilities, if a referendum had been taken a vast majority of the security holders would have favored continuing operations through 1973 in the hope of passage of the Rail Act or something like it and thereafter for a reasonable time for formulating and consummating the FSP. In our view therefore, operations were continued up to and beyond the point of the railroads' own "cashlessness" not solely to serve the public interest, nor solely to serve the private interest of the estates, but to serve both.
These and other considerations we have canvassed might seem to lead to a complete refusal to recognize pre-conveyance CUE. Yet even the Government parties do not urge us to go quite that far. At argument, although not explicitly in brief, they were willing to leave open for further consideration the case of the small railroad that might have been able to secure abandonment authority and to have discontinued operation but for the Rail Act before April 1, 1976, and the case where administration claims exceed the value of the bankrupt estates. We have gone somewhat beyond the former concession and have held that CUE would begin to accrue on a date when the Interstate Commerce Commission should have granted an application for abandonment or sale which would have been filed if the Rail Act and the debate over its passage had not rendered this futile and operation had been discontinued as a result.[68] We realize that this solution will not be truly satisfactory to anyone, especially to the various trustees and the estates they represent, although both they and the Government parties should take account of our correlative holding that, to the extent that the Government has used its "reasonable time to secure abandonment or sale permission" argument to postpone the accrual of CUE, it cannot use the same period a second time to reduce the value of the properties conveyed on April 1, 1976 in any discounting required to reflect the need of securing regulatory approval for dispositions in a non-Rail Act world.
Parties on both sides have noted that in contrast to the almost total disagreement on when CUE commenced to accrue, there is a considerable measure of agreement with respect to the elements entitled to recognition as its components. Now that we have prescribed guidelines with respect to the accrual of CUE, we do not think it unreasonable to ask the parties to endeavor, *1390 in the same spirit of cooperation they have manifested on many matters, to flesh these out by agreement among themselves in terms of precise properties and dates.[69] One thing that has been obvious about these proceedings from the beginning is that no amount of effort by counsel and the court will produce a mathematically precise figure of what the estates are constitutionally entitled to receive and the Government is required to pay; the best for which anyone can hope is a fair approximation. We realize that the amounts here at stake are large; that the Government parties may be fearful that any agreement, even on the limited points here suggested, would be criticized by members of Congress or the media as too favorable to the railroads; and that the trustees may be equally fearful of claims that they have not fully discharged their fiduciary responsibilities. But it has now become apparent that agreement on some points will be vital if this court is to meet what we once thought to be the unduly pessimistic five to ten year timetable forecast by Representative (now Secretary of Transportation) Brock Adams, see 119 Cong.Rec. 36355 (Nov. 8, 1973); 384 F.Supp. at 926. If this court can assist by elaboration of this opinion or otherwise, it stands ready to do so.
Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.

On Motions for Reconsideration of Opinion of April 19, 1977 on Compensable Unconstitutional Erosion (CUE).
PER CURIAM:
On April 29, 1977 the PC Trustees moved for reconsideration of our opinion of April 19, 1977, dealing with compensable unconstitutional erosion (CUE). A number of other transferors and the PC Company joined in the motion. Because of uncertainty as to the proper date for seeking reconsideration of rulings of this court, we issued a notice fixing May 25, 1977, as a date by which motions for reconsideration of our CUE opinion could be filed and permitting the Government parties to answer by June 7. A number of other parties subsequently joined in the motion of the PC Trustees, the Government parties filed a response, and the PC Trustees and others, with our permission, have filed a reply.
Although the PC Trustees, stating their intention to raise on appeal their disagreement with the "basic framework" of our opinion, limit themselves to three grounds hereafter discussed, we think it wise also to advert to their preliminary criticisms that "the Court had no basis on the record, for example, for suggesting that the cessation of operations by Penn Central would necessarily have required environmental impact statements, or for now expressing its conviction that `. . . it would have been impossible [for Penn Central] to complete abandonment proceedings before April 1, 1976.' (Op. at 37.)" Although the need for environmental impact statements with respect to abandonments effected through ICC proceedings has been taken as a given in all this court's proceedings, see 180-Day Appeals, 384 F.Supp. 895, 922 (1974), if the PC Trustees or others wish to attempt showings that such statements might have been dispensed with, they are free to do so. Similarly, our remark as to the impossibility of obtaining ICC authority to abandon the entire PC operation by April 1, 1976 even if an application had been filed early in 1973 expressed our strong conviction; it should not be taken as precluding an attempt at contrary proof, see op. at 1374-1375.
We turn now to the three specific points urged in the motion:
(1) The PC Trustees ask us to make clear that, in connection with efforts to demonstrate the feasibility of a cessation of operations prior to April 1, 1976, we should allow proof that the transferors would have become *1391 "cashless" prior to that date and, indeed, that the Government parties should have the burden of proving that they would not have. This argument is based on a misunderstanding of pp. 1375-1379 of our opinion. In the absence of the Rail Act, the transferors' "Brooks-Scanlon rights" would have accrued on a cessation of operations (a) for which the ICC had granted leave or at the end of a reasonable time for the ICC's acting on applications for such leave, or (b) on the transferors' attaining "cashlessness," whichever was earlier. We held there would be no erosion taking if the Government, by providing emergency financial aid, postponed (b) to  but not beyond  (a). The notion of hypothetical applications for leave to cease operations (including the qualification that, generally speaking, these may be considered to have been filed in early 1973) was used by us to determine how long the Government could constitutionally require operation even after what, absent the Rail Act, would have been the point of cashlessness. It is thus irrelevant that, as the PC Trustees contend, absent the Rail Act or some other form of interim assistance, they would in fact have reached the point of cashlessness before an application for leave to cease operations could have been carried to a conclusion and operations were discontinued.
(2) The PC Trustees' second point is that in light of the ICC's decisions in Okmulgee Northern Ry. Co. Abandonment, 320 I.C.C. 637 (1964), which had not been called to our attention in the briefing on CUE, and subsequent ICC cases, we were in error in supposing that an application for sales to other railroads or, in some instances, to public bodies would have required approval under § 5(2) of the Interstate Commerce Act, see at n. 37. The PC Trustees read these cases as holding that when the applicant is seeking to abandon all of its railroad operations, authority under § 1(18) [now slightly amended as § 1a(1)] is all that is required. The Government parties question the correctness of Okmulgee and its progeny and their applicability to transactions of the magnitude that would have here been involved. As the Government parties also suggest, there is no need to determine these questions until we know what the transferors say they would have proposed. If they wish to contend that the ICC could have authorized these solely under § 1(18) and that this would have been materially different from authorization under § 5(2) in procedure or result, they are free to do so.
(3) The final point made by the PC Trustees, namely, that the Rail Act itself operated as an erosion taking, was fully considered by us, see at n. 46, and we find no need for further discussion of it.
Except as herein indicated, the motions for reconsideration are denied. In light of § 303(d) of the Act and the summer recess of the Supreme Court, we shall postpone the effective date of this order of denial until November 1, 1977.
NOTES
[1] As noted in our opinion of October 18, 1976, 425 F.Supp. 266, 269-70, we shall treat the "fair and equitable" language of § 303(c) as equivalent to the standard of "constitutional minimum", unless in the valuation proceedings there should be a specific and supported claim that the standards differ in result.
[2] See also the last sentence of § 303(c)(3).
[3] See also Senate Conference Report No. 595, 94th Cong., 2d Sess. 205 (1976), as corrected 122 Cong.Rec. S749 (daily ed., Jan. 28, 1976), U.S.Code Cong. & Admin.News 1976, p. 148:

The base value of the certificates is to be increased by whatever amount, if any, of compensable unconstitutional erosion the special court finds to have occurred in the estate of the railroad transferor of rail properties holding the particular series of certificates during the period of the bankruptcy proceeding of such estate.
[4] In our 1974 opinion, we concluded that we could direct compensation for unconstitutional erosion in any of the properties owned by the estate of a railroad under the Act, whether or not the properties were conveyed, so long as the railroad was the transferor of some properties; we noted, however, that our ability to assure full compensation was limited, especially if the transferors' principal valuation claims should be sustained, 384 F.Supp. at 925-26 & n.51, leaving suit in the Court of Claims under the Tucker Act as the only alternative for any transferor whose claims were thus not satisfied. The current Act makes explicit our ability and obligation to take into account compensable unconstitutional erosion in determining the base value of the certificates of value which are issued to every railroad that has transferred some properties to ConRail. The unrestricted language of § 306(c)(4) and the interest expressed by the 1976 Conference Committees of the House and Senate in promoting judicial economy, see infra, indicates we should include in the base value of the CV's all compensable unconstitutional erosion suffered by a transferor to ConRail, whether in the properties transferred to ConRail or to a profitable railroad or in properties not transferred at all. However, as the PC Trustees note, any post-conveyance erosion damages which accrue after this court's final decision on valuation still would have to be left to the Court of Claims for remedy.

The House and Senate Conference Committees commented on the erosion provisions as follows:
For reasons of judicial economy, if for no other reasons, it is desirable that the court that is rapidly acquiring vast knowledge of the regional rail reorganization problem take into account the so-called erosion claims in its section 303(c) determinations. There is no intention even remotely to imply that there may be merit in a claim for pre-Act erosion, or indeed for any erosion. However, we are interested in simplifying the litigation, and take note of the fact that there is now pending in the Court of Claims an action alleging both pre-Act and post-Act erosion. In line with the same goal, it is our intention that all actions for unconstitutional erosion now pending or subsequently filed in the Court of Claims be stayed until the Special Court has ordered the distribution of the securities and the certificates of value pursuant to section 303(c)(4) of this Act.
S.Rep.No.520, 94th Cong., 2d Sess. 205 (1976), as corrected 122 Cong.Rec. S749 (daily ed., Jan. 28, 1976) (clerical corrections), U.S.Code Cong. & Admin.News 1976, pp. 148, 220.
[5] We added that "a relatively early resolution of these issues [was] essential in order to enable us to direct what studies should be prepared, since USRA contends that there has been no CUE."
[6] At oral argument counsel for the Penn Central (PC) Trustees indicated a belief that we had not set for discussion the issue whether valid erosion claims began on January 2, 1974, the date of enactment of the Rail Act, or any date subsequent to that date and prior to April 1, 1976. We see no basis for such a reading of the June 16 Memorandum, see fn. 5. While we singled out claims for erosion prior to January 2, 1974 and subsequent to March 31, 1976, as creating special problems, the memorandum made clear that we wished to deal comprehensively with all relevant legal issues pertaining to CUE. No different conclusion was justified by so much of our opinion of October 18, 1976, 425 F.Supp. at 270-71 as deferred decision whether the Rail Act was a reorganization statute or a condemnation statute or both. In any event the briefs and arguments include all material relevant to our making a determination whether CUE begins to accrue on January 2, 1974, or at some date between then and March 31, 1976, if it had not previously begun to accrue, and the brief of the PC Trustees itself argues, p. 113, n.1:

If, contrary to our contentions, it should be determined that Penn Central did not reach the point of erosion taking prior to the passage of the Rail Act, then it would be our contention that passage of the Act itself accomplished such a taking by subjecting Penn Central to a further period of compelled operations beyond the point of unreorganizability.
Also we have had the benefit of reading the full presentation in the brief of the PC Trustees filed January 6, 1977, to the effect that CUE began to accrue on January 2, 1974, if it had not done so before.
[7] See Pennsylvania v. ICC, 175 U.S.App.D.C. 263, 535 F.2d 91, 97-98 & n.13 (1976), cert. denied, 429 U.S. 834, 97 S.Ct. 99, 50 L.Ed.2d 99 (1976), suggesting that this was a matter for the Court of Claims.
[8] In addition, we do not pass at this time on the claim, advanced only by the Erie Lackawanna (EL) Trustees, for any income tax liability that may, despite P.L. 94-253 (March 31, 1976), 90 Stat. 295, accrue on an award for CUE.
[9] There is general recognition by the parties that determination of the amount of some elements of physical erosion, notably deterioration of plant that has been conveyed, will depend on the theory of valuation. Such deterioration would be of much greater importance if a property were to be valued on the basis of sale for continued rail use than if it were to be valued on the basis of a sale for scrap. Because of these and other considerations, this opinion will not discuss the elements of erosion but will be devoted solely to the issue of the date when erosion claims accrued.
[10] The railroads in Brooks-Scanlon and Eastern-Texas had engaged in interstate commerce, but the Brooks-Scanlon case was decided before the Transportation Act of 1920 adding § 1(18) was passed, and the Interstate Commerce Commission had authorized abandonment of interstate operation by the Eastern Texas, see Texas v. Eastern Texas R. R., 258 U.S. 204, 42 S.Ct. 281, 66 L.Ed. 566 (1922).
[11] One of them, the Eastern Texas Railroad, was wholly without cash or credit and could not operate at all. See 264 U.S. at 83, 44 S.Ct. 247. The same may have been true of the railroad in the Bullock case, see 254 U.S. at 519, 41 S.Ct. 193.
[12] Although some transferors quote Justice Holmes' earlier statement, 251 U.S. at 399, 40 S.Ct. at 184:

A carrier cannot be compelled to carry on even a branch of business at a loss, much less the whole business of carriage.
it is clear that the portion of the sentence preceding the comma is not the law. See Fort Smith Light & Traction Co. v. Bourland, 267 U.S. 330, 45 S.Ct. 249, 69 L.Ed. 631 (1925) (Mr. Justice Brandeis writing for a unanimous Court). Cf. Baltimore & Ohio R. R. v. United States, 345 U.S. 146, 73 S.Ct. 592, 97 L.Ed. 912 (1953).
[13] Efforts in the earlier New Haven and Central of New Jersey reorganization proceedings, which might have served as precedent, had been largely aimed at having state or local government bodies assume the burden of commuter passenger service and grant tax relief. The federal government undertook the provision of intercity passenger operations by the National Railroad Passenger Service Act of 1970, 84 Stat. 1327 (1970). There has been a continuing controversy between the PC Trustees and the National Railroad Passenger Corporation (Amtrack) concerning the adequacy of payments by the latter.

Certain of the changes proposed by Penn Central in February 1971 were beyond the complete control of either the federal or state and local governments. For instance, the PC Trustees complained of the "merger guarantee payments" received by PC employees, conditions to which the Pennsylvania and New York Central Railroads had themselves agreed to effect the merger under conditions of labor peace. Similarly, the PC's proposal for a joint labormanagement committee to review work rules was addressed to the transportation unions, not the government.
Other changes would have required governmental action, for instance the proposal that "below cost" freight rates be prohibited by legislation, or that the ICC separate rate increases for line haul services and terminal services, but the report does not detail whether the PC had actually proposed draft legislation for the former, or had made application to the ICC for the latter. The PC's proposal for "rationalizing" freight plant  apparently that any losing branch of a railroad should be required to stay in operation, even during abandonment proceedings, only if the branch operating losses were compensated  might be faulted in the case of a profitable railroad for ignoring the constitutional logic of Fort Smith Light & Traction Company v. Bourland, supra, 267 U.S. 330, 45 S.Ct. 249, 69 L.Ed. 631; again, there is no indication that the PC Trustees had actually put forward draft legislation for such subsidization.
[14] The September 1971 report noted that the Trustees' own studies to determine which lines should be abandoned would take at least three years to complete, although earlier conclusions could be drawn as to 1900 miles of possible abandonments and 5200 miles of track which clearly would be retained; in addition the reorganization court had already approved the preliminary filing of abandonment applications for 1928.4 miles of track with the ICC.
[15] The report noted some progress in the PC's efforts to rationalize its operations, including an agreement with the transportation unions implementing work rule changes, and the repeal of New York's and substantial modification of Indiana's full-crew law.
[16] It was estimated, for example, that whereas in 1973 the existing railroad would have a deficit of $157.2 million in net railway operating income, an 11,000 mile railroad  if all employees unnecessary to the operation of such a smaller road (except for excess trainmen on crews to be retained) were let go without cost  would have had net railway operating income of $59.0 million.
[17] One reason was that "labor would expect large labor protection payments, amounting to $774.1 million through 1976 alone, if Penn Central were free promptly to move to a railroad of 11,000 miles."
[18] On the same date the ICC submitted a report, Ex parte No. 293 (1973).
[19] ICC approval was to be obtained through the submission of Transfer Reports. The Plan provided that

The Commission shall promptly hold hearings on the Transfer Reports to determine whether acceptance of the offers recommended by the Trustees or the approval of any offer recommended for rejection by the Trustees would be consistent with the standards of Section 1(18) of the Interstate Commerce Act, Section 77 of the Bankruptcy Act, and of due process. The Commission's decisions shall be submitted to the Court for approval either on an individual offer basis or in the aggregate.
Nothing was said about § 5(2) of the Interstate Commerce Act.
[20] The court noted, however, that

It should be emphasized at the outset that the Court is not now called upon to adjudicate the merits of any proposed plan of reorganization; indeed, § 77(d) of the Bankruptcy Act makes it clear that this Court lacks power to review any proposed plan until it has been considered by the Commission and certified to this Court by the Commission.. .
. . . . .
Under the provisions of the Bankruptcy Act, there are, arguably, two approaches to a resolution of the Debtor's precarious financial position. The first of these is by way of a plan of reorganization. Such a plan may or may not ultimately provide for liquidation of all or part of the Debtor's railroad. That issue is not before the Court at this time. . . . The Trustees' proposal merely initiates the proceedings before the Interstate Commerce Commission. The plan which they propose to file expressly provides that, in the event of Congressional action before October 1, their plan would be amended. Thus, the Trustees' plan is sufficiently flexible to cover all possible eventualities.
363 F.Supp. at 1265-66.
[21] See Tennessee Central Ry. Abandonment, 333 I.C.C. 443 (1968), 334 I.C.C. 235 (1969); In re Tennessee Ry., 304 F.Supp. 789 (M.D.Tenn. 1969). The ICC might rightfully have objected, however, that the PC reorganization plan made no provision for seeking abandonment permission under § 1(18), see 347 I.C.C. at 82-85, for the termination of service within 10 weeks if no interim compensation was forthcoming to stem erosion, and for the sale for scrap after 6 months of any of the rail assets for which offers had not been received for continued rail use. Under the existing provisions of the Interstate Commerce Act, there is no indication that such § 1(18) proceedings could have been dispensed with, see Bankruptcy Act § 77(o); Tennessee Central Ry. Abandonment, supra, 333 I.C.C. at 444-45.
[22] Similar requests were later made by other creditor interests.
[23] Subsequently, on May 2, 1974, the PC reorganization court made the finding required under § 207(b) of the Rail Act as to whether the PC was "reorganizable on an income basis within a reasonable time under section 77." In re Penn Central Transportation Company, 382 F.Supp. 831 (E.D.Pa.1974). Though Judge Fullam found that the PC was not so reorganizable, this conclusion was not based on the nature of PC's transportation market as such, but on the PC's cash shortage, its burden of administrative expenses, its need for capital to maintain the quality of freight service, and its presumed inability to reduce the size of its plant to 15,000 or 11,000 miles with expedition. For such smaller plants, assuming the quality of freight service did not deteriorate, the reorganization court estimated a net railway operating income (before fixed charges) of $39.8 million and $104.9 million, respectively, in 1976, and $102.8 million and $171 million in 1978. Id. at 842. Even with its current plant, the court projected that PC would improve its net railway operating income from negative $153.2 million in 1974 to negative $14.0 million in 1978. Id. at 840.
[24] USRA was authorized to extend the certification date to a date not more than 30 days after March 12, 1976, by notice filed with this court, the Congress, and the reorganization courts not later than February 10, 1976. § 209(c) as amended. USRA did not take advantage of this authorization.
[25] In Brooks-Scanlon the railroad had ceased operating, initially with permission, but the Louisiana Railroad Commission, after a hearing, had ordered it to resume; Mr. Justice Holmes treated with contempt a suggestion that, despite the full hearing and order by the Commission directing a resumption of operations, the railroad must start a new proceeding with a petition for leave to discontinue which would surely be denied, 251 U.S. at 400, 40 S.Ct. 183. In Bullock the railroad had earlier applied to the Florida Railroad Commission for leave to discontinue and had been refused, 254 U.S. at 519, 41 S.Ct. 193. The Eastern Texas had received authority from the Interstate Commerce Commission to abandon its interstate business, see fn. 10 supra, and the Court found there was no Texas statute requiring it to obtain authority to abandon intrastate operation.
[26] In a footnote to the passage quoted above, the court cited Bankers Trust Company v. Gebhart, 195 F.2d 238 (2 Cir. 1952), in which an indenture trustee of a hopelessly losing railroad sought to prevent a further loss of equity allegedly available for bondholders that would occur through the reorganization trustees' conveying the railroad's equity interest in two locomotives to the RFC in exchange for an extension of maturity on two other classes of equipment trust certificates. The Second Circuit, speaking through Judge Frank, directed the reorganization judge to pass on the indenture trustee's petitions to require the reorganization trustees to apply to the ICC for abandonment before making the conveyance. Again there was no hint that abandonment proceedings could be dispensed with.
[27] One of the points in dispute between the New Haven Trustee and Penn Central was the Trustees' demand that a larger portion of the consideration be paid in stock rather than in debt. See New Haven Inclusion Cases, 399 U.S. 392, 483-84, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970).
[28] The Court's reasoning does lead to the conclusion that to the extent the Government parties make use of the delay between enactment of the Rail Act (or any earlier date taken as starting the period for governmental action) and April 1, 1976, to defeat a claim for CUE on the ground that at least that much time would have been consumed in obtaining permission to abandon or sell, that period cannot be taken into account a second time in determining when the proceeds of sales would come into hand. See 399 U.S. at 466, 90 S.Ct. 2054, quoting with approval Judge Anderson's opinion, 304 F.Supp. at 801.
[29] Though the New Haven Trustee opposed the PC's application in early 1971 to issue $100 million in federally guaranteed trustees' certificates under the Emergency Rail Services Act, and disputed the feasibility of the PC Trustees' April 1, 1972 plan of reorganization, see text supra, he did not move the reorganization court to dismiss the § 77 proceedings until October 9, 1973.
[30] Though the Trustees announced in February 1973 that $600-800 million government aid to finance improvements over a period of years was prerequisite to further attempts to effect an income-based reorganization, because of the cash shortages faced by the Penn Central and the urgent need to improve the condition of the railroad plant if freight revenues were to be increased, they also said that with such aid reorganization still seemed feasible. As the Trustees noted on January 1, 1973, "[W]ithout government financial assistance for improvement of the railroad, a reorganization of Penn Central cannot be achieved in 1976 . . .. If this support is forthcoming promptly, the Trustees believe that Penn Central can be successfully reorganized on a private-income basis by 1976," assuming the three other conditions of eliminating unnecessary employees, uneconomic freight lines, and uncompensated passenger service were also attained. On February 1, the Trustees again noted, "The Trustees believe that the plant and equipment investment program described in this Report will result in a viable railroad which can remain in the private sector."

Similarly, as noted in the text, supra, Judge Fullam's March 6, 1973 order warning of a possible October dismissal of the reorganization proceeding was expressly left open to reexamination in light of legislative developments, and was apparently based on the increasing size of PC's erosion burden rather than a conclusion as to PC's ultimate reorganizability. In authorizing the PC Trustees to submit a plan of reorganization to the ICC in July 1973 providing for liquidation of the railroad, the court expressly noted it was not empowered to pass on the merits of the plan until after ICC review, see fn. 20 supra. In the October 12, 1973 hearing Judge Fullam deferred action on proposals to dismiss the reorganization, pending legislative action.
The PC Trustees argue that at the time of the October 12, 1973 hearing, "the principal legislative draft was a September 27, 1973 subcommittee print of H.R. 9142 (the `Shoup-Adams bill')," and that under §§ 303(d) and 102(5) of the bill the consideration for the properties was to be "the greater of fair liquidation value or going concern value thereof as of September 30, 1973." The Trustees suggest that if Judge Fullam could have foreseen the design of the Rail Act as enacted, he would have insisted on some protection against further erosion as a price of not dismissing the § 77 proceedings.
Whether the court so relied on the formulation of a subcommittee print is open to question; Under Secretary of Transportation Barnum, who presented a report on the status of pending legislation on behalf of the Government parties at the October 12 hearing, did not mention the September 30 date in his statement, and other government parties specifically noted that "[t]he final form of that legislation remain[ed] to be threshed out." (Hearing transcript, Oct. 12, 1973 at 9869). By November 3, 1973, when H.R. 9142 was reported out by the House Commerce Committee, the provision on consideration had been modified to read
either the fair liquidation value or going concern value thereof as of September 30, 1973, as provided in the final system plan, except that in no event shall such rail properties be valued at more than the constitutional minimum required for their acquisition . . .. (Emphasis added.)
and the accompanying House Report, H.R.Rep. No.620, 93d Cong., 1st Sess., provided contradictorily at page 53 that "The value of the consideration must equal the fair and equitable value of the rail properties as of the date of the conveyance."
In any event, whatever the judge's desires might or might not have been, no one could give him any such guarantee as the PC Trustees suggest; the only alternative to deferring action that was open to him was the truly unthinkable one of dismissing the § 77 proceeding just when Congress was on the verge of adopting comprehensive legislation in response to proposals advanced by the PC Trustees with his approval. Even if he had followed such a course and his action had not been stayed pending appeal, an equity receiver would still have had to apply for authority to sell or abandon unless abandonment was forced by the foreclosure of liens. See United States v. 27.7 Acres of Land, 178 F.Supp. 712, 715 (W.D.Ark. 1959); Interstate Commerce Act § 1(3) ("common carrier" includes all natural or artificial persons engaged in transportation as common carriers for hire, and "persons" includes receiver of a company); id. § 1(20) (a "receiver .. acting for" a carrier is liable to criminal penalties for authorizing or permitting any violation of § 1(18)).
[31] The court qualified its holding by saying that statutory requirements of obtaining ICC and state commission approval apply "unless such statute inexorably conflicts with the Constitution" but that the record before it did not "demonstrate that such conflict has happened here  at least, not as yet." 485 F.2d at 215; see id. n. 42. This also appears to have been the situation at the date of the October 12 hearing before Judge Fullam; at no time did he find that continued operation pending applications to the ICC for abandonment or sale under § 77(o) would constitute a taking forbidden by the Fifth Amendment in the absence of just compensation. In any event we have previously characterized this statement in the Central Railroad of New Jersey opinion as running "counter to the explicit assumption of all courts, including the Supreme Court in the New Haven Inclusion Cases." 384 F.Supp. at 920 n.33.

The Third Circuit's Central Railroad of New Jersey decision was followed in In re Erie Lackawanna Railway, 517 F.2d 893 (6 Cir. 1975). The court of appeals there reversed an order of the reorganization court, made before the EL became subject to the Rail Act, permitting discontinuance of two Ohio passenger trains where the Ohio commission had delayed for 10 months in acting on the trustees' discontinuance request and the trustees had not applied to the ICC for expedited relief under § 13a(2) of the Interstate Commerce Act. The case is less helpful to the Government parties than the Central Railroad of New Jersey decision in that the EL's financial condition at the time was less serious; however, the Sixth Circuit panel did extend the Central Railroad of New Jersey rationale to a situation in which an agency application for discontinuance or abandonment was already pending, per contra 485 F.2d at 213.
Many transferors rely on the decision in the so-called Columbus Option case, In re Penn Central Transportation Co., 494 F.2d 270 (3 Cir.), cert. denied, U. S. v. Bankers Trust Co., 419 U.S. 883, 95 S.Ct. 147, 42 L.Ed.2d 122 (1974), as dispensing with any requirement of application for authority to abandon. The issue there was quite different. The United States held $100 million of trustees' certificates issued under the Emergency Rail Services Act which constituted a prior lien on the Penn Central's mortgaged assets and also a lien on unmortgaged assets. The United States and the PC Trustees wished to have the proceeds of sale of unmortgaged assets used for operations; the mortgagees objected that this would increase the impact of the prior lien of the United States on the mortgaged assets and thus would have a similar effect to use of proceeds of the mortgaged assets themselves and that, in the absence of a finding of prospects of a successful reorganization, this was forbidden by the rule of marshaling. The court sustained this claim. How far it was from upholding the position here advanced by transferors is shown by its remark concerning the Rail Act, 494 F.2d at 283:
Congress, in devising a legislative solution, will be bound by the fifth amendment to pay the fair value of the Penn Central properties at the time any new rail transportation entity takes them. Any amount beyond that value, which would compensate secured creditors for the erosion which took place while the reorganization court and the ICC waited for a congressional solution, would be a matter of legislative grace. It would be hazardous, indeed, to speculate on the likelihood of favorable exercise of such largess from public funds, especially in view of the form of the legislation recently enacted. (Footnote omitted.)
[32] During the course of the § 77 reorganization up to January 1973, the PC Trustees filed applications with the ICC for the abandonment of approximately 3,000 miles of line; applications for abandonment of about 800 miles were granted. We are not told what efforts the PC Trustees made, before the ICC's "freeze" on abandonment proceedings in 1973, see 384 F.Supp. at 921-22, to press the applications on which the ICC took no action.
[33] The implication for the situation here of Judge Anderson's conclusion and the Supreme Court's seeming approval of it is all the stronger in that during the two years from 1961 to 1963, when the New Haven was determined to be unreorganizable on an income basis, the Trustees had sought federal and state aid in the form of tax relief and subsidies to allow the New Haven to operate on a break-even basis. 289 F.Supp. at 456. Despite the fact that no subsidies of adequate size were forthcoming from the interested states or the federal government, Judge Anderson did not consider that the government had lost its entitlement to an abandonment proceeding during which it could examine alternatives for continuing rail service if inclusion of the New Haven in the Penn Central had not seemed possible.
[34] We likewise cannot subscribe to the argument that applications to abandon would have been futile in view of the logjam they would have created at the ICC and the "freeze" imposed by the Commission in 1973 and lifted in 1974, see 384 F.Supp. at 921-22. While the Commission could not reasonably be expected to deal with abandonment applications of the importance here under discussion in a fast-food manner, we cannot assume that if the Commission had been confronted with applications for total or large-scale abandonment by the PC and the other bankrupt railroads in the Northeast, it would have proceeded on a "business-as-usual" basis or refused to proceed because of its temporary freeze. We repeat what Judge Adams said in In re Central Railroad of New Jersey, supra, 485 F.2d at 213 (footnotes omitted):

There having been no application made, there can be no showing that delay or frustration would be the inevitable result.
[35] In fact the record affords no basis for belief that the PC Trustees favorably considered abandonment beyond an 11,000 mile core until early 1973. As will later appear, we take that date, when serious discussion of what became the Rail Act began, as the date when the clock started to run against the Government in the case of the PC.
[36] It can, of course, be argued that this burden should be shared by all citizens. But the problem was peculiarly that of the bankrupt railroads, and it seems as legitimate to saddle them with the cost of reasonable legislative as of administrative consideration.
[37] Section 5(2) of the Interstate Commerce Act, which requires a rail carrier to seek ICC approval of any sale or lease of rail property to another carrier, would apply to any sale or leasing of rail properties to a state transportation authority that already operated a rail service handling cars moving in interstate commerce, even where the relevant trackage was located wholly within the acquiring state. See United States v. California, 297 U.S. 175, 185-86, 56 S.Ct. 421, 80 L.Ed. 567 (1936); National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 n.18 (1976); compare 45 U.S.C. §§ 1 and 6 ("any common carrier engaged in interstate commerce by railroad"), with 49 U.S.C. § 1.
[38] We find additional support for this conclusion in Judge Anderson's finding, 304 F.Supp. at 801, and the Supreme Court's apparent approval of his finding, 399 U.S. at 460, 489-90, 90 S.Ct. 2054, that an abandonment proceeding for the New Haven would have taken approximately three years, from late 1963 to December 31, 1966; the New Haven proceeding would have involved far fewer considerations of public interest and competitive effect than the abandonment of major eastern carriers that formed an essential adjunct to the services of other carriers serving the west and the south.
[39] When we wrote in 1974, the fate of any initial FSP seemed in serious doubt because of the deep split in opinion between the Secretary of Transportation and the Rail Services Planning Office (RSPO) of the ICC over the treatment of low density lines and the popularity of the RSPO's position with local communities. The Secretary's 1974 report, Rail Service in the Midwest and Northeast Region, Vol. I, at 3, 69-74, concluded that 25 percent of the region's railroad mileage was "potentially excess", because the number of freight carloads originated or terminated on those lines annually fell below the number judged by the Department of Transportation to be necessary for a "high probability of financial viability". Only the lines which had such a high probability were recommended for inclusion in the FSP at that time, with certain exceptions; the others were to be further studied, to see whether the 1972 standard data used was not accurate in the individual case, or whether tariff adjustments could improve their viability. But if the line was eventually found to be "excess", according to the Department's profitability criterion, its continued operation was said to be up to the States, local communities, and shippers, who might want to undertake subsidization of the line under § 304(c) of the Rail Act, or to acquire it.

As noted in our 1974 opinion, 384 F.Supp. at 921 n.36, the public hearings conducted by the RSPO on this report aroused great public reaction, in part because of uncertainty as to what was meant by the designation of a line as potentially excess, but in larger part because of disagreement with the use of line-by-line profitability as the sole criterion for continuation of service.
Witness after witness described the adverse economic, social, and environmental impact such actions would have on communities. It was contended that rail service discontinuances would result in market distortions, economic depression and social dislocations. Moreover, it was repeatedly stated that rail discontinuance is inconsistent with our national environmental and energy conservation policies.
. . . . .
A number of witnesses took issue with the DOT Report's assumption that alternate modes of transportation could fill in the gap if major reductions in rail service were effectuated.
RSPO, Evaluation of the Secretary of Transportation's Rail Services Report, at 10 (May 2, 1974). The Planning Office's own recommendations were that USRA
should reject the Secretary's method of determining branch line viability which was based primarily  if not solely  upon the number of carloads handled.
and
should consider lines as segments of a total system and evaluate their capabilities for contributing to overall system efficiency, rather than requiring that each line or mile of track meet a test of independent profitability.
Id. at 3, 4. The fight over abandonment criteria continued during 1975, compare I Preliminary System Plan at 6, 15, 20 (February 26, 1975) with RSPO's Evaluation of the Preliminary System Plan at 6, 49-57 (April 28, 1975), but did not delay Congressional acceptance of the Final System Plan.
[40] We do not mean this permission to be read as an open-ended invitation to burden these proceedings with consideration of possible abandonment of small branch lines now seen to be desirable by hindsight; we are referring to abandonments of major significance to a particular carrier, e. g., the Ann Arbor's car ferry operations (see Section V(E)), even though not of its entire property. The trustees would also have the burden of showing that they were in fact ready to propose such abandonments, see fn. 14 supra.
[41] In the absence of some measure of agreement on the guidelines with respect to putative abandonment proceedings such as we urge in Section VI of this opinion, we shall doubtless wish to arrange a conference on this subject during the next few months. It may be that the taking of evidence with respect to the dates when abandonment applications would have been filed and should have been concluded should be confided to a single master or to a member of this court rather than assigned to a number of masters dealing with different properties. The project here suggested, however, may turn out to be so closely related to the problem of an "alternative scenario" to be discussed in our CMV opinion that, in the absence of agreement, the interests of all parties would be served by consolidating the two.
[42] These sections authorized the Secretary of Transportation to provide funds to the railroads prior to conveyance. Section 213, as amended, provides for $282 million to be paid to railroad trustees "as ... necessary for the continued provision of essential transportation services." Section 215, as amended, authorizes the financing with $300 million in obligations of agreements between the Secretary and the trustees for three purposes:

(1) to perform the program maintenance on designated rail properties of such railroads until the date rail properties are conveyed under this Act;
(2) to improve rail properties of such railroads; and
(3) to acquire rail properties for lease or loan to any such railroads until the date such rail properties are conveyed under this Act, and subsequently for conveyance pursuant to the final system plan, or to acquire interests in such rail properties owned by or leased to any such railroads or in purchase money obligations therefor.
Funds under either section used for program maintenance or improvement of designated properties are subject to § 215(b)(1), which provides that
to the extent that physical condition is used as a basis for determining, under section 206(f) or 303(c) of this Act, the value of properties subject to such an agreement and designated for transfer to the Corporation under the final system plan, the physical condition of the properties on the effective date of the agreement shall be used . . ..
We have previously indicated that § 213 "provid[es] for grants rather than loans" and that § 215 advances "are not debts of the estates of the borrowing railroads, although they must be assumed by Conrail." In re Penn Central Transportation Company, 384 F.Supp. 895, 909 & n. 17 (1974). The Government's brief, at 27, characterizes § 213 aid as "grants" and § 215 assistance as "loans to ConRail that for present purposes are effectively grants to the transferors." On March 31, 1976, the Secretary of Transportation and USRA agreed, pursuant to § 215(c), to release ConRail from all but approximately $43 million of the obligations incurred in financing the § 215 expenditures.
The following tables show what aid was provided each railroad:

 § 213
 Balance available
 under existing
 Grants made Disbursements grants 
Penn Central $187,718,003 $187,718,003 $ ---
Central of New Jersey 22,320,000 22,320,000 ---
Lehigh Valley 8,550,000 8,125,000 425,000
Erie Lackawanna 31,696,956 31,696,956 ---
Ann Arbor 4,687,000 4,687,000 ---
Reading 7,970,000 7,850,000 120,000
Lehigh & Hudson River 796,807 796,807 ---
 ____________ ____________ ________
 Total $263,738,766 $263,193,766 $545,000
Source: Report of the Comptroller General of the United States (CED-76-161) (Nov. 15, 1976).

 § 215
--------------------------------------------------------------------------------------
 Approved
 215 Unexpended
 Program Expenditures Balances
Funds Applied:
 Program Maintenance:
 Penn Central Agreement754 .......... $85,000,000 $83,412,677 $1,587,323
 Penn Central Agreement755 .......... 69,300,000 69,222,369 77,631
 Erie Lackawanna Agreement756 ....... 1,900,000 1,878,610 21,390
 Erie Lackawanna Agreement757 ....... 8,100,000 8,030,634 69,366
 Central of N.J. Agreement758 ....... 1,200,000 1,085,584 114,416
 Central of N.J. Agreement759 ....... 500,000 420,305 79,695
 Reading Agreement7513 .............. 50,000 -0- 50,000
 Reading Agreement7514 .............. 3,650,000 3,647,458 2,542
 Lehigh Valley Agreement7511 ........ 2,500,000 2,166,520 333,480
 Lehigh Valley Agreement7512 ........ 3,762,000 3,454,903 307,097
 ____________ ____________ __________
 Program Maintenance, Total ........ 175,962,000 173,319,060 2,642,940
 ============ ============ ==========
 Maintenance of Way Machinery:
 Penn Central Agreement751 .......... 14,700,000 13,727,973 972,027
 Erie Lackawanna Agreement7516 ...... 110,000 95,331 14,669
 Lehigh Valley Agreement7517 ........ 500,000 494,906 5,094
 ____________ ____________ __________
 Maintenance of Way Machinery, Total 15,310,000 14,318,210 991,790
 ============ ============ ==========
 Lehigh Valley Locomotives: ............ 3,450,000 3,435,096 14,904
 ============ ============ ==========
 Equipment Obligations:
 Erie Lackawanna Agreement7518 ...... 7,800,000 7,794,543 5,457
 Reading Agreements 7521 & 7528 ...... 1,650,000 1,645,257 4,743
 Penn Central Agreements 7522 & 7529 . 33,550,000 32,260,026 1,289,974
 Ann Arbor Agreement7531 ............ 90,000 85,510 4,490
 Central of N.J. Agreement7519 ...... 464,800 -0- 464,800
 ____________ ____________ __________
 Equipment Obligations, Total ...... 43,554,800 41,785,336 1,769,464
 ============ ============ ==========
 Maintenance & Equipment Program:
 Penn Central Agreement7515 ......... 53,200,000 53,135,844 64,156
 ============ ============ ==========
 Interest Expense:
 Gross Expense ....................... 7,796,491
 Interest Income ..................... 689,500
 Net Expense ......................... 7,500,000 7,106,991 393,009
 ============ ============ ==========
 Capital Projects and M/W Cars:
 Penn Central Agreement761 .......... 290,000 289,000 1,000
 ============ ============ ==========
 Available for Other Use ............... 733,200 -0- 733,200
 ____________ ____________ __________
 Total ............................. $300,000,000 293,389,537 $6,610,463
 ============ ==========
Cash in Bank ............................ 49,866
 ____________
 Total funds applied ............... $293,439,403
 ============
--------------------------------------------------------------------------------------
Source: Third Annual Report of the United States Railway Association at 22 (June 30, 1976).

[43] We do not think that the Penn Central gains anything from the additional claim that the government guarantee of its trustees' certificates under the Emergency Rail Services Act of 1970, 84 Stat. 1975, amounted to governmental aid forced upon it. These benefits were received at a time when the PC Trustees clearly contemplated a successfully reorganized railroad and urged enactment of a federal loan or guarantee scheme, see Hearings on Emergency Rail Services Legislation Before the Subcomm. on Transportation and Aeronautics of the House Comm. on Interstate and Foreign Commerce, 91st Cong., 2d Sess., at 496-509 (1970), as did PC management, see id. at 247, 251, 252, 268, 367, although the Penn Central Company submitted a separate statement opposing direct federal loans, see id. at 579-80.

The PC's reliance on the receipt in August 1973 of approximately $16 million in loans under the Emergency Rail Facilities Restoration Act of 1972, 86 Stat. 1304 (the "Storm Agnes" legislation), stands on even weaker ground unless one is willing, as we are not, to accept the proposition that the railroads' "cashlessness" claims are strengthened by efforts of the government to abate the effects of natural disasters. The funds provided in August 1973 were largely designed to restore railroad facilities to their pre-storm condition and not as part of a long-range response to the financial plight of the railroads.
[44] Northeast Rail Transportation Hearings Before the Subcomm. on Transportation and Aeronautics, House Comm. on Interstate and Foreign Commerce, 93d Cong., 1st Sess., pt. 1, at 246 (1973).
[45] We think this is so despite the absence of a uniform favorable response to the legislative proposals of 1973 by the various trustees. Our review of the congressional hearings held during 1973 convinces us that although none wholeheartedly welcomed the legislation that became the Rail Act, neither did any transferor except the CNJ Trustee object as clearly or as vociferously as some now claim. Certainly the Penn Central did not object with the fervor it now contends, see Hearings on Northeast Rail Transportation Before the Subcomm. on Transportation and Aeronautics, House Comm. on Interstate and Foreign Commerce, 93d Cong., 1st Sess. 245-54; Hearings on the Northeastern Railroad Transportation Crisis Before the Surface Transportation Subcomm. of the Senate Comm. on Commerce, 93d Cong., 1st Sess. 392-407, 888-902. Instead, the various trustees generally testified as to the condition of their respective roads and then in rather vague terms noted what features federal legislation for continued rail operation should contain, only some of which were at odds with the emerging Rail Act.
[46] We likewise cannot accept the argument that the Rail Act itself was the Government's solution and all erosion after its passage thus must be a taking. The Rail Act was not a solution but rather afforded the framework for achieving one, and the total time spent in considering and implementing the law was not unreasonably long. How the case would stand with respect to erosion if the processes of the Rail Act had not succeeded is an issue we happily need not decide.
[47] The Norwich & Worcester Railroad, the nature of whose operation is described in Norwich & Worcester Railroad v. United States, 408 F.Supp. 1398, 1400 (Sp.Ct.R.R.R.A.1976), and the Peoria & Eastern Railroad, which was operated by PC under an agreement, have filed briefs in which they take the position that whatever disposition is appropriate for PC's CUE claims will be appropriate for them. We think it fair to allow these railroads, if so advised, to attempt the showing indicated in text supra.
[48] Unhappily the Government parties did not favor us with detailed briefing with respect to these claims, including the characterizations by the several roads of their financial and reorganization histories on which they are based. As a result, although we have done our best to check and supplement the histories recounted in the Trustees' briefs from such materials as are available to us, we have had to rely in considerable part on the Trustees' submissions. Of course, the Government is still free to take issue with any of these submissions if and when the Trustees attempt the showing we have required for entitlement to pre-conveyance CUE.
[49] This phrase requires some elucidation in view of what seems to have been the prevalent assumption that the trustee of a losing railroad in a § 77 proceeding could disregard § 1(18) of the Interstate Commerce Act. As previously indicated we regard this assumption as erroneous except when cessation of operations would have been required by "cashlessness" or other circumstances beyond a trustee's control. However, in view of the climate prevailing in 1975, the phrase "would have filed for abandonment" should be read to include an application to the reorganization court for authority to cease operations.
[50] Counsel construed the reservation as including post-bankruptcy tax claims together with any post-bankruptcy administration claims. See Transcript of argument, 124-25.
[51] Authorization was later granted, R. D. Timpany, Trustee of the Central Railroad Co. of New Jersey  Abandonment of Operation Between Phillipsburg, N.J. and Hudson, Pa., 342 I.C.C. 227 (1972), and the reorganization court then authorized abandonment with compliance by the trustee with certain conditions laid down by the ICC, see In re Central Railroad of New Jersey, 486 F.2d 1124, 1126 (3 Cir. 1973), cert. denied, Pennsylvania v. U. S., 416 U.S. 938, 94 S.Ct. 1940, 40 L.Ed.2d 289 (1974).
[52] After rejecting the claim that it was bound to follow the decision on the Pennsylvania abandonment as "law of the case" and stare decisis, the en banc court distinguished the earlier decision on the ground that there applications for abandonment were pending and the ICC "arguably unduly delayed" action on them. 485 F.2d at 210-11.
[53] To wit, the LV, the Reading and the Western Maryland.
[54] The reorganization court's denial of leave to the State of Pennsylvania and its Public Utility Commission to seek judicial review of these ICC decisions in another district court was affirmed by the Third Circuit, which noted that no appeal had been taken from the reorganization court's order sanctioning the CNJ's retirement from Pennsylvania and that the reorganization court could have convened a three-judge court under the Urgent Deficiencies Act, former 28 U.S.C. §§ 2321-25, if timely application to it had been made. In re Central Railroad of New Jersey, 486 F.2d 1124 (3 Cir. 1973), cert. denied, Pennsylvania v. U. S., 416 U.S. 938, 94 S.Ct. 1940, 40 L.Ed.2d 289 (1974).
[55] These included negotiation with the Chessie for a lease of CNJ's freight facilities; a merger with LV and the Reading; and other discussions between the Trustees of the LV and the CNJ.
[56] The Trustee admits that a contributing factor to the breakdown in these negotiations was the defeat of Governor Cahill of New Jersey in the Republican primary in June 1973 and his administration's subsequent understandable position that any changes in the contract should be left to his successor. We fail to see how the United States has any responsibility for this; the CNJ operates in a democracy and must take such interregna as part of the process.
[57] The Trustees' Preliminary Plan of Reorganization, dated June 15, 1973, contemplated the filing by November 23, 1973 of either a plan of reorganization or, should federal relief not be forthcoming, a petition for cessation of operations and liquidation.
[58] Substantially the same point was made by the Commonwealth of Pennsylvania in the Reading's reorganization court: in its memorandum in opposition to the Institutional Investors Reading Group's amended petition, the State argued among other things that cessation required a § 1(18) certificate and that the ICC must pass on any reorganization plan.
[59] The Reading also argues that by December 1, 1973 it was entitled to cease operations and commence liquidation without any further judicial or administrative proceedings since at that time the road lacked sufficient reserves and current assets to cover operating expenses (including those necessary for liquidation) and leave enough capital for an orderly liquidation. An affidavit of John A. Brennan, Jr., submitted in support of this claim, indicates that the Reading has included in the "current liabilities" taken into account liabilities that would become current upon cessation, equipment obligations due within one year, and a large item for unspecified "miscellaneous" liabilities. In addition, this affidavit points to the Reading's receipt of §§ 213 and 215 funds as staving off a forced cessation in 1975 and the first quarter of 1976. Apart from the fact that the Reading's claim of "cashlessness" as to December 1, 1973 seems to go beyond the exception we would recognize for truly forced cessations, the role of governmental assistance in preventing cessation no more favors the Reading than it does the Penn Central.
[60] The Reading further claims an independent right to CUE from January 1, 1975 on the ground that from then onward § 213 funds were made more freely available to the other roads than to it because of the Reading's comparatively strong cash reserves. We do not see, however, how this allegedly "discriminatory" application of § 213 gives rise to any special entitlement to CUE. If the Reading depleted its cash reserves during this period, then it can include this as an element of erosion for which it will be entitled to compensation if it can make the showing we describe in text necessary for any CUE payments. A railroad has no special right to erosion compensation because its continued operation had a particularly severe impact on one category of its assets  in the Reading's case, cash.
[61] In light of our discussion above of this general argument, we need not further discuss the LV claim that the Trustees' 1973 termination petition demonstrates a cash position that entitled it to immediate cessation of operations as of October 1, 1973 within footnote 31 of our 1974 opinion.
[62] In 1966 overhead loaded traffic constituted 96.1% of the L&HR's business. By 1972 the proportion had fallen to 83.6%, as a result of loss of the bridge traffic rather than any significant increase in originated or terminated traffic.
[63] The L&HR had no mortgage liens.
[64] All told EL received $27.9 million in grants for wages and operating costs and $3.8 million for equipment obligations under § 213 and $7.8 million for such obligations and close to $10 million for maintenance of its properties pursuant to § 215  an aggregate exceeding $49 million.
[65] Indeed, as the Government parties argue, it is quite remarkable that EL's belated entry did not force USRA to request a further delay for the submission of FSP.
[66] Some support for the latter alternative may be found in § 3(b)(4) of the Emergency Rail Services Act of 1970, 84 Stat. 1976, which provided that the Secretary of Transportation, after consultation with the ICC, shall require as a condition to a government guarantee of trustee certificates under the Act that

in the event of actual or threatened cessation of essential transportation services by the railroad, the Secretary shall have the option to procure by purchase or lease trackage rights over the lines of the railroad and such equipment as may be necessary to provide such services by the Secretary or his assignee, and, in the event of a default in the payment of principal or interest as provided by the certificates, the money paid or expenses incurred by the United States as a result thereof shall be deemed to have been applied to the purchase or lease price. The terms of purchase or lease shall be subject to the approval of the reorganization court and the operation over the lines shall be subject to the approval of the Commission pursuant to the provisions of section 5 of the Interstate Commerce Act, but in no event shall the rendition of services by the Secretary or his assignee await the outcome of proceedings before the reorganization court or the Commission.
Another possibility was the ICC's legislative proposal, H.R. 6591, which provided for a lease and leaseback arrangement between the bankrupt lines and the United States for a period not to exceed three years with the difference between revenues and operating costs subsidized by the federal government. See Penn Central Transportation Company Reorganization, 347 I.C.C. 45, 121 (Sept. 28, 1973).
[67] The House Report, H.R.Rep.No.620, 93d Cong., 1st Sess. 28 (Nov. 3, 1973), accompanying H.R. 9142, set forth the basic views of the Committee on Interstate and Foreign Commerce concerning a federal solution as follows:

This Committee decided from the beginning that any legislation it would report to the House would not be a "Creditors Relief bill." The Committee feels that in our free enterprise system, investments should be made freely without a public guarantee that the investment will reap profits for the financier. The investors and creditors of the bankrupt carriers took certain business risks, and should not expect the American taxpayer to "bail them out" merely because their investments were failures. And too, the investors and creditors of railroads know before they make such investments of the traditional and historic "public interest" character of the industry. In short the investment fortunes of a few cannot override the economic fate of the nation.
The Committee also decided that the public interest would not be served if these bankrupt carriers were shut down and sold on the "auction block." The services these carriers perform are essential to the nation, and the blow to the economy if such services were interrupted only briefly, would be devastating. This is a matter which affects not only the economy, but also the defense needs of the nation. The future of rail transportation in the Northeast transcends the interests of not only the investors, the creditors, the managers and trustees, and the people and the industries of the Northeast region  it is an American problem, one affecting all of us.
The Committee further decided that the economy could not sustain nationalization of the rail industry in the North, nor would it be good public policy. The Committee fervently believes that private enterprise must flourish in the transportation industry, and that it would set a precedent for not only the rail industry, but all transportation modes, if the government became the owner and operator of the Northeast rail carriers. Recognizing the public necessity of a viable, functioning rail system, and the importance it has in our nation, the Committee acknowledges that some federal assistance is an absolute necessity to assist in the restructuring of the system. No one judge can accomplish the complex restructuring of all rail carriers in the region, and the problem cannot be isolated by individual carrier  all bankrupt carriers in the region must be considered in any legislative solution.
Similarly, referring to the use of a new corporation's securities to pay for the transferred properties and use of federal loan guarantees instead of grants, the report of the Senate Committee on Commerce, S.Rep.No.601, 93d Cong., 1st Sess. 18 (Dec. 6, 1973), U.S.Code Cong. & Admin.News 1973, pp. 3242, 3259, accompanying S.2767, explained that "the very process by which the bill would create a new healthy railroad out of the bankrupt ones arose from th[e] strong desire to limit the use of Federal money." Congress was rather clearly concerned with minimizing the cost to the federal government and avoiding the perception of either a "bail-out" or "nationalization": these concerns would hardly have engendered federal responses that would have put the erosion burden as well as the conveyance cost squarely on the federal government.
[68] Our many references to the need of proving the consummation of an abandonment or sale are not to be taken as excluding proof that a purchaser might have obtained authority to operate on an interim basis or have agreed to absorb part or all of interim losses.
[69] Agreements of this sort could, of course, be without prejudice to the rights of either side to have the basic elements of our decision with respect to the accrual of pre-conveyance CUE reviewed by the Supreme Court.